THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LAZARDO DIAZ, Defendant-Appellant.

First District (2nd Division)   No. 61403

Opinion filed May 4, 1976.—Rehearing denied May 25, 1976.

Julius Lucius Echeles and Frederick F. Cohn, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Linda Ann Miller, and Edward V. Vienuzis, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Defendant, Lazardo Diaz, was indicted for the murder of Jose Mercado. (Ill. Rev. Stat. 1973, ch. 38, par. 9—1.) After a jury trial, he was found guilty of the lesser included offense of voluntary manslaughter (Ill. Rev. Stat. 1973, ch. 38, par. 9—2(b)), and was sentenced to the penitentiary for a term of 2 to 6 years.

Defendant now appeals and presents five issues for our review: (1) whether the evidence was sufficient to sustain the conviction beyond a reasonable doubt; (2) whether the jury was misled by an improper instruction which was aggravated by the prosecution's closing argument; (3) whether the court improperly excluded defendant's testimony

regarding his state of mind; (4) whether the court improperly limited a defense witness' attempt to explain an apparent prior inconsistent statement; and (5) whether the court abused its discretion in not sentencing defendant to probation or periodic imprisonment. In view of defendant's challenge to the sufficiency of the evidence, a summary of the evidence presented at trial is necessary.

Don Thomas testified that he was driving east on Webster approaching Halsted at approximately 9:15 p.m. on June 19, 1973. As he neared Halsted, he observed a young boy on the north side of Webster facing south and a man on the south side of Webster facing north. The young boy commenced to cross Webster and pointed south. As he did so, the man turned to the south and pulled his arm forward. The witness then saw a flash and heard a report from a weapon held by that individual. Two more shots came "very fast." The witness observed a second man, eight to ten feet away, fall to the ground. The witness continued through the intersection and returned to the fallen man within 15 to 30 seconds. He saw no weapon on the ground in the vicinity of the fallen man. He identified defendant as the person who fired the weapon.

David Leisey was sitting on his front porch, approximately 100 to 150 feet west of the intersection of Webster and Halsted, shortly after 9 p.m. on June 19, 1973. He heard a noise like a "firecracker" come from the direction of Webster and Halsted. As he turned, he saw a man falling, and another individual, about five feet away, walk toward the fallen man, and when directly over him, fire two more times. A few seconds elapsed between the first and the second and third shots.

Marc Amstadter was visiting David Leisey on Leisey's front porch shortly after 9 p.m. on June 19, 1973. He also heard a shot and turning, saw two men approximately eight to ten feet apart at the corner of Webster and Halsted. As one of the men fell, the other individual, who had a shiny object in his hand, hesitated for a couple of seconds and then fired two more shots. The fallen man was already on the ground, eight to ten feet away, when the second and third shots were fired. The witness went to aid the fallen man and did not see any weapon.

Juan Corchado was about half a block away from Webster and Halsted shortly after 9 p.m. on June 19, 1973. He also heard three shots ring out, one right after the other, and he then ran to the corner where he saw Jose Mercado fall to the ground. He inquired of defendant why he shot Mercado and defendant responded, "Well, I shot him because he was fucked up." The witness saw no weapon lying around the victim or in the street.

George Spila, a Chicago police officer, arrived at the scene, arrested defendant, and advised him of his rights. Defendant then told the officer that Mercado had been bothering him, his family, and his children for

three or four months and he could not tolerate it any more. Defendant never mentioned that Mercado had a weapon. He recovered a revolver from defendant containing three spent shells and three live bullets. The live rounds were "dum-dum" bullets, a more lethal type of bullet.

Dr. Edward Shalgos, a pathologist for the Cook County coroner, testified that he performed an autopsy on the victim, Jose Mercado. Mercado was stocky, heavy and muscular. The autopsy revealed that Mercado had been shot three times, once in the shoulder, once in the front stomach, and once in the back of the left chest. Death resulted from two of the three bullets.

Juan Diaz, defendant's 13-year-old son, was at the corner of Webster and Halsted with his mother shortly after 9 p.m. on June 19, 1973. He saw his father talking with Jose Mercado. His father began walking away, but Mercado followed him. His father then turned around and again started talking to Mercado. When his father again began walking away, Mercado followed, took something out of his pocket, and raised his arm. Mercado was about three to four feet from his father when his mother screamed. At this point, his father turned and shot Mercado three times. Although he was unable to perceive what Mercado had in his hands, it was shiny. He, his father, mother, and brother then went to their apartment. After the police arrived, his father surrendered to the police and gave them his gun.

Romona Diaz, defendant's wife, testified that shortly after 9 p.m. on June 19, 1973, her son, David Pena, came home crying. Pena told defendant that Mercado had been beating him up. Defendant told Pena to go downstairs and call the police and then prepared to go downstairs himself. The witness asked him not to go because Mercado had been drinking, but in spite of these exhortations, defendant went downstairs. She saw defendant and Mercado engaged in a conversation. Defendant started to depart but Mercado followed, cursing defendant. Mercado then drew a knife and when Mercado was three to four feet from defendant, she screamed. Defendant turned, pulled a revolver, and shot Mercado.

David Pena, defendant's stepson, testified that on the evening of June 19, 1973, Jose Mercado stopped him, and slapped him several times. Pena went home and related to his father what had transpired. His father told him to go downstairs and call the police because there was no phone in their apartment. He tried to call from a "police box" on the street, but it wouldn't work. Defendant came downstairs and asked Mercado why he had struck Pena. Mercado responded, "because I felt like it," and then started cursing defendant. Defendant then turned around and commenced walking away, but Mercado followed, cursing. Defendant stopped and implored, "Please, I don't want no trouble. I just want you to leave me and my family alone." Defendant again attempted to leave, but Mercado followed, cursing. Defendant stopped a second time and said,

"Please, I don't want no trouble with you." Defendant attempted to leave a third time as Mercado followed him. When Mercado was two to three feet from defendant, he had a knife in his outstretched arm. As someone screamed, defendant turned and fired three rapid shots into Mercado. As he and his family returned to their apartment, Mercado's friends gathered around his body.

On cross-examination, Pena stated that he and his father had not gotten along with Mercado in the past. The prosecution also questioned Pena about an earlier court proceeding in which he had testified that Mercado had "stabbed" him, not slapped him. The witness responded that there must have been a mistake in the transcript. The prosecution also questioned Pena about a statement he had signed for the police early on the morning of June 20 in which he stated that he had not noticed anything in Mercado's hands at the time of the shooting. The witness replied that he had never given such a statement and that the police must have been mistaken.

Ronald Doke was in the vicinity of Webster and Halsted at approximately 9 p.m. on June 19, 1973. At that time, he saw David Pena, holding his jaw, coming down the street. A little later, he saw defendant talking with Mercado. Defendant began to walk away from Mercado, then stopped and began talking with Mercado again. As defendant began to leave a second time, Mercado approached defendant from behind with a knife in his outstretched arm. When Mercado was two to three feet from defendant, someone screamed, and defendant turned and fired three rapid shots into Mercado. On cross-examination, the witness denied that he had been so drunk the evening of the 19th that he was asked to leave a police station. The witness also denied telling a police officer that Mercado attacked defendant with a bottle.

Randy Saltz was in the vicinity of Webster and Halsted when he heard three shots rapidly fired. He arrived at the scene of the shooting within 30 seconds to see a young male latino leave the scene, jump into a car, and speed away.

Lazardo Diaz testified that his son, David Pena, came home and told him that Mercado had slapped him. He told David to go downstairs and call the police, but David couldn't get through to the police. Defendant then went downstairs and after finding Mercado and four others drinking beer, asked Mercado why he had hit David. Mercado answered, "Because I don't like him. I don't like you." Defendant responded, "Okay, I don't want any trouble with you boys; just leave my family and me alone," and began to leave. However, Mercado and his four friends followed him and cursed him. So, for a second time, defendant turned and asked Mercado to leave him and his family alone. As he again walked away, he heard a scream, turned, and observed Mercado, three to four feet away,

ready to strike him in the back with a knife. He fired very quickly but did not remember how many times he fired. When the police arrived, he surrendered and told them, "I have to do it."

On cross-examination, defendant admitted telling Officer Spila that Mercado had been bothering his family and admitted that he never told Officer Spila that Mercado had a knife. However, defendant denied ever threatening to kill Mercado.

The defense presented one character witness that Mercado's reputation in the neighborhood was "very bad," and two character witnesses that defendant's reputation in the community for being a law-abiding citizen was very good.

The State presented the testimony of Francisco Valentin in rebuttal. Valentin was in defendant's grocery store talking to defendant in the beginning of June 1973. Valetin testified that during that conversation, defendant said, "One of these days, I am going to kill this mother fucker [Mercado]." On cross-examination, Valentin denied owing defendant any money and specifically denied owing defendant $500 for groceries.

Officer Frank Heatley also testified in rebuttal. He took a statement from David Pena in the early morning hours of June 20, 1973. In that statement, Pena never mentioned that Mercado had a knife. In fact, Pena specifically stated that he did not notice anything in Mercado's hands at the time of the assault. The officer saw Pena read that statement before he signed it. He saw Ronald Dokes late on June 19 and early on June 20 and concluded that he was under the influence of alcohol. He was creating such a disturbance that he was asked to leave the police station.

Officer John Chapman testified in rebuttal that he too concluded that Ronald Dokes was intoxicated later on June 19. In fact, Dokes was creating such a disturbance that he was escorted from two different police stations. Dokes told the witness that Mercado had a broken bottle in his hand at the time of the incident.

In surrebuttal, David Pena testified that he never read his statement that Officer Heatley gave him before he signed it. Also in surrebuttal, defendant testified that he never threated to kill Mercado in Valentin's presence. Defendant further stated that on June 19, Valentin owed him $400 to $500 for groceries and that Valentin still had not paid him.

■■ Defendant contends that the evidence was insufficient to sustain his conviction for voluntary manslaughter beyond a reasonable doubt. Defendant theorizes that the jury's acquittal on the charge of murder "must" have been premised on their belief that defendant believed Mercado was attacking him and that defendant actually believed the force he used was necessary to prevent imminent death or great bodily harm. Having all but postulated a finding of self-defense, defendant concludes that the jury found him guilty of voluntary manslaughter only

because they were misled by the instructions and the prosecution's closing argument into believing that they could acquit defendant only if Mercado "in fact" had a knife.

Defendant's argument must fail for the simple reason that it is misdirected. The jury's acquittal of murder says nothing about the reasonableness of defendant's belief that the force he used was necessary. Defendant's argument emphasizes the wrong finding to be analyzed. The finding of not guilty of murder is not before us. Rather, the duty of the reviewing court is to determine whether the conviction rendered can be justified by the record. *People v. Stewart*, 46 Ill. 2d 125, 262 N.E.2d 911.

Defendant's theory was self-defense. Section 7—1 of the Criminal Code states:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." (Ill. Rev. Stat. 1973, ch. 38, par. 7—1.)

The jury found defendant guilty of voluntary manslaughter. In pertinent part, voluntary manslaughter is defined as follows:

> "A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (Ill. Rev. Stat. 1973, ch. 38, par. 9—2(b).)

The question thus becomes whether there was sufficient evidence for the jury to conclude that defendant's belief that he was in danger of losing his own life or suffering great bodily harm was unreasonable. *People v. Speed*, 52 Ill. 2d 141, 284 N.E.2d 636.

The issue of self-defense is one of fact. (*People v. Myers*, 18 Ill. App. 3d 700, 310 N.E.2d 407.) When the evidence is conflicting, it is for the jury to decide whether a homicide was murder, manslaughter, or justified as self-defense. (*People v. Davis*, 35 Ill. 2d 55, 219 N.E.2d 468.) Once the jury has reached a verdict, a reviewing court will not disturb that finding unless the evidence is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt. *People v. Smith*, 7 Ill. App. 3d 912, 288 N.E.2d 901.

Although defendant presented evidence that Mercado had a knife and

was about to stab him, there was ample evidence that no weapon was seen or found near decedent's body. The sobriety of the only non-family member to testify that Mercado had a knife was seriously questioned and his testimony as to the knife was impeached by a prior statement that Mercado had a broken bottle. Moreover, the jury could consider the fact that defendant's son had given a prior statement denying that Mercado had a knife and defendant himself had not mentioned a knife to Officer Spila.

The jury could thus have concluded that, although Mercado was a quarrelsome individual who had been drinking and had earlier attacked defendant's son, when he was advancing on defendant, he was unarmed. It is uncontradicted that defendant shot Mercado three times, one bullet entering Mercado's back and that the bullets used were of a type specifically altered to be more lethal than ordinary bullets. Although the danger need not be real and the deceased need not be armed with a deadly weapon in order for a person to have a reasonable belief that his life is endangered to the point of justifying a killing (*People v. Adams*, 113 Ill. App. 2d 205, 252 N.E.2d 35), we think that defendant here could not reasonably have believed that killing was necessary to prevent his own death or great bodily harm at the hands of the deceased. (*People v. Davis*, 33 Ill. App. 3d 105, 337 N.E.2d 256.) And even if he did so believe, the use of force to the extent of shooting Mercado three times, once in the back, was unnecessary to prevent such harm. (*People v. Watkins*, 13 Ill. App. 3d 411, 300 N.E.2d 308.) There was sufficient evidence for the jury to reject defendant's claim of self-defense and return a verdict of voluntary manslaughter. We find nothing so improbable as to raise a reasonable doubt of defendant's guilt.

■■ Defendant next contends that the jury was misled by an improper instruction which was aggravated by the prosecution's improper closing argument.

Without objection by defendant, People's Instruction No. 14 was given to the jury. That instruction in pertinent part stated:

"To sustain the charge of voluntary manslaughter the State must prove the following propositions:

First: That the defendant intentionally or knowingly performed the acts which caused the death of Jose Mercado; and

Second: That when the defendant did so he believed that circumstances existed which would have justified killing Jose Mercado; and

Third: That the defendant's belief that such circumstances existed was unreasonable;

Fourth: *That the defendant was not justified in using the force which he used.*" (Emphasis added.)

Defendant's argument centers on the fourth proposition of Instruction 14 which he contends was improperly included in the instruction. Defendant argues that the fourth proposition misled the jury into believing that his conduct would constitute self-defense "*only* if it *actually* was necessary to use said force to prevent death or great bodily harm."[1] Defendant contends that this misconception was aggravated by the prosecution's closing argument which allegedly implied the same requirement.

We first note that defendant did not object to the challenged instruction at trial. It is well settled that the failure to object to the giving of an instruction at trial constitutes a waiver of the right to object on review. (*People v. Calcaterra*, 33 Ill. 2d 541, 213 N.E.2d 270; *People v. Pazell*, 399 Ill. 462, 78 N.E.2d 212; *People v. Kelly*, 11 Ill. App. 3d 475, 297 N.E.2d 322.) However, even if defendant had made timely objection at trial, defendant's challenge to Instruction 14 would fail.

■■ As already noted, defendant's theory was one of self-defense. Self-defense is an affirmative defense (Ill. Rev. Stat. 1973, ch. 38, par. 7—14), and once it is raised, the burden is on the State to prove beyond a reasonable doubt that defendant did not act in self-defense. Ill. Rev. Stat. 1973, ch. 38, par. 3—2.

Whenever Illinois Pattern Instructions in Criminal Cases contains an instruction applicable to a given case, the IPI-Criminal instruction shall be used. (Ill. Rev. Stat. 1973, ch. 110A, par. 451.) The Illinois Pattern Instructions in Criminal Cases contains a chapter devoted to instructions to be used when affirmative defenses are raised. (IPI-Criminal, ch. 25.) In the introduction to that chapter, it is stated:

> "The Committee has concluded that the elements or issues of an affirmative defense should be treated in two ways: *first*, by definition following the definition of the crime with which the defendant is charged * * *, and *second*, in the same instruction with the issues or elements of the crime and the state's burden of proof * * *. Therefore, when an affirmative defense has been raised the appropriate issues and burden of proof-defenses instruction should be superimposed upon the appropriate issues and burden of proof-crimes instruction so that the jury receives a single instruction covering all the issues in the case." (IPI-Criminal, at 435-36.)

The same chapter contains an instruction entitled "Issues in Defense of

---

[1] We note that this identical language now challenged in the manslaughter instruction was also included in the murder instruction. Defendant was found not guilty of murder and thus, understandably, claims no error in its inclusion in the murder instruction. We only note the apparent inconsistency in arguing that the jury was misled by certain language in one instruction while relying on the jury's verdict on another instruction (see defendant's first argument) containing identical language.

Justifiable Use of Force." (IPI-Criminal No. 25.05.) In pertinent part, Instruction 25.05 provides as follows:

"To sustain the charge of _____ , the State must prove the following propositions:

*First*: Element of the crime; and

*Second*: Element of the crime; and

*Third*: That the defendant was not justified in using the force which he used."

The IPI also contains an instruction entitled, "Issues in Voluntary Manslaughter-Intentional-Belief of Justification." (IPI-Criminal No. 7.06.) In pertinent part, that instruction provides as follows:

"To sustain the charge of voluntary manslaughter the State must prove the following propositions:

*First*: That the defendant intentionally or knowingly performed the acts which caused the death of _____; and

*Second*: That when the defendant did so he believed that circumstances existed which would have justified killing _____; and

*Third*: That the defendant's belief that such circumstances existed was unreasonable."

People's Instruction No. 14, which defendant now challenges, was labelled IPI No. 25.05 in the trial court. A comparison of Instruction 14 with IPI Instruction 25.05, set out above, reveals that the prosecution did exactly what IPI instructed it to do. The prosecution took the issues of voluntary manslaughter, found in 7.06, and engrafted them on to 25.05. In short, People's Instruction No. 14 is exactly what Instruction 25.05 calls for. In Instruction 14, the jury was given the State's burden of proof both as to the issues of voluntary manslaughter and to the issue of self-defense.

Although defendant claims that instructing the jury "that the defendant was not justified in using the force which he used" misled the jury, that is exactly what the jury was required to find because of defendant's theory of the case. To not so instruct the jury would eliminate the State's burden to prove defendant guilty beyond a reasonable doubt as to the issue of self-defense as required by section 3—2.

We note that in *People v. Padget*, 21 Ill. App. 3d 426, 315 N.E.2d 646, the court found the failure to include such a proposition in a voluntary manslaughter instruction not to be error, but we also note the court's strong reliance on the remaining instructions to properly instruct the jury on that burden of the State. Moreover, in *People v. Pettis*, 23 Ill. App. 3d 623, 320 N.E.2d 194, the court approved of combining 25.05 with a manslaughter instruction so that in one instruction the jury was informed of the elements of the crime and that the State must prove that defendant was not justified in using the force which he used. To the extent that

*Padget* and *Pettis* conflict on such a procedure, we find *Pettis* more persuasive.[2]

Defendant also argues that the fourth proposition of Instruction 14 improperly instructed the jury that *they* must believe that deadly force was necessary rather than the proper instruction that it is defendant's belief under the circumstances that controls a finding of self-defense. We cannot agree with such a strained reading of the fourth proposition. The plain meaning of the words do not so instruct the jury. Rather, as already indicated, that proposition only informs the jury that it is the State's burden to prove that the defendant was not justified in using the force he did. The third proposition in Instruction 14 properly informed the jury that it was defendant's belief that was the controlling factor, not the jury's perception of how they or a reasonable man would have reacted. Moreover, the jury was also given IPI Instruction 24.06 which separately and correctly informed the jury on the issues to be considered in the use of force in defense of a person.

We conclude that People's Instruction No. 14 was properly drafted in accordance with the dictates of IPI 25.05 and that the issues as there stated could not have misled or confused the jury.

■■ As to defendant's complaints regarding the prosecution's closing argument, one instance cited by defendant was a comment by the prosecutor that he felt the evidence indicated Mercado was unarmed at the time of the killing. Such a comment was a fair inference to be drawn from the record. As such, it was permissible. (*People v. Prim*, 53 Ill. 2d 62, 289 N.E.2d 601; *People v. Watkins*.) The other instance was a comment that Mercado was shot three times, once in the back. Such a comment was again supported by the record. Although defendant endeavors to construe both comments as efforts to misinstruct and confuse the jury, both comments were legitimate argument based on the record, in support of the State's theory that the killing was murder. We find no error in the closing argument.

Defendant next contends that the court improperly excluded defendant's testimony regarding his state of mind at the time of the

---

[2] It should also be noted that there is an inconsistency within the IPI itself. The last chapter of the IPI is entitled "Sample Sets of Instructions." The first set of sample instructions given are those required in a hypothetical murder-self-defense situation. In setting out the instruction to cover the "issues in murder," the example correctly combines 7.02 and 25.05. (Although not involved in the instant case, it should be further noted that this "sample" mysteriously adds a Fourth proposition that has no basis in either 7.02 or 25.05.) (IPI-Criminal, at 460.) However, the example suggested to cover the issues of voluntary manslaughter when self-defense is raised does *not* include the instant questioned Fourth proposition. The example inexplicably does not combine 7.06 with 25.05, but rather, sets out 7.06 alone. (IPI-Criminal, at 460-61.) We acknowledge this deviation with the directions on pages 435-36 of the IPI set out earlier, but find the directions better reasoned than the sample set of instructions.

killing. Defendant argues that when the theory is self-defense, it is error to prevent defendant from presenting direct evidence as to his state of mind regarding what he believed at the time he asserts he acted in self-defense. (*People v. Biella*, 374 Ill. 87, 28 N.E.2d 111; *People v. Johnson*, 108 Ill. App. 2d 150, 247 N.E.2d 10.) We agree, but find no such exclusion present in the instant case.

■■ At trial, the following colloquy occurred during direct examination of defendant:

"Defense Counsel: Now, when you saw that knife in his hand, Mr. Diaz, did you have fear that he was about to inflict bodily harm on you?

Assistant State's Attorney: Objection.

Defense Counsel: At the time you saw the knife, did you have a sincere and honest conviction that he was about to stab you?

Assistant State's Attorney: Objection.

Court: The objection is sustained to that question, but it is overruled on the previous question.

Defense Counsel: Were you afraid when he had the knife, sir?

Defendant: Yes, sir.

Court: All right, ask the next question."

Defense counsel then began a new area of inquiry.

As the record thus clearly indicates, defendant was allowed to testify regarding his state of mind at the time of the shooting. In fact, the court's final comment indicated no circumscription whatever on defense inquiry into the subject of defendant's state of mind at the time of the incident. It was apparently counsel's decision, not the trial court's, to forgo this general line of questioning in any greater detail. Defendant's argument that such testimony was excluded by the trial court is not supported by the record.

Defendant next contends that a defense witness was prevented from explaining an apparent prior inconsistent statement.

David Pena, defendant's son, had testified on direct examination that he had been slapped by Mercado. Pena testified that it was for this reason that defendant went down to see Mercado. On cross-examination the following colloquy occurred:

"Assistant State's Attorney: Now originally, sir, sometime ago, you claimed to have been stabbed by the deceased?

Defense Counsel: Objection, he didn't say that.

Court: Sustained.

Assistant State's Attorney: Not today, sir, but in another court proceeding on the 27th day of June, 1973, before Judge Pompey,

didn't you say that the deceased had stabbed you earlier that evening.

Witness: No.

Assistant State's Attorney: Well, specifically, do you remember these questions being asked of you on June 27, 1973 before Judge Pompey, by the Assistant State's Attorney:

Q. Now, prior to this problem, this problem that we had here about your father across the street, prior to that time, was there any altercation between you and the deceased, Jose Mercado?

A. Yes.

Q. What happened?

A. The deceased, Jose Mercado, had stabbed me.

Do you recall giving those answers to those questions, sir?

Witness: There must have been some kind of mistake, what they meant was he slapped me.

Assistant State's Attorney: Objection to the answer, not responsive.

Court: Sustained.

Assistant State's Attorney: So you didn't say that? There must be a mistake?

Witness: Right."

The record thus indicates that Pena was allowed to explain the prior inconsistent statement. He was specifically given the opportunity to state that there must have been a mistake. If the defense wished to elaborate on that explanation, it was incumbent upon the defense to do that on redirect examination. In fact, Pena was questioned on redirect but no questions were asked regarding the prior statement.

Defendant cites authority for the proposition that a witness is entitled to explain what appears to be a prior inconsistent statement. (*Schmitt v. Chicago Transit Authority*, 34 Ill. App. 2d 67, 179 N.E.2d 838; *Clayton v. Bellatti*, 70 Ill. App. 2d 367, 216 N.E.2d 686; *People v. Hicks*, 28 Ill. 2d 457, 192 N.E.2d 891.) However, all those cases involved endeavors by counsel to rehabilitate a witness on redirect examination. There was no such attempt to do so in the instant case.

■■ Here, the witness was allowed to explain his prior statement. If the inconsistency was not further explained, it was due to defense counsel's failure to elicit that explanation. Defendant's argument that the trial court prevented further explanation is without merit.

■■ Defendant's final argument is that the trial judge abused his discretion in not sentencing defendant to probation or periodic imprisonment. In this regard, defendant contends that the trial judge imposed a penitentiary sentence solely because defendant fired a second

and third shot after Mercado was already wounded. Citing *Brown v. United States*, 256 U.S. 335, 65 L. Ed. 961, 41 S. Ct. 501, defendant argues that a trial judge cannot consider the number of shots fired in evaluating the seriousness of the crime charged.

Initially, it must be noted that there is nothing in the record to support defendant's statement that a penitentiary sentence was imposed solely because of the number of shots fired. Defendant's conclusion to that effect is nothing more than pure speculation. More importantly, defendant's reliance on *Brown* is misplaced. *Brown* was concerned with the effect of additional shots on a purported theory of self-defense. It in no manner involved the matters to be considered in imposing sentence. Rather, it is well established that a judge in determining the character and extent of punishment may look to the facts of the crime and may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense. *People v. Adkins*, 41 Ill. 2d 297, 242 N.E.2d 258.

In the instant case, defendant presents several mitigating factors to establish an abuse of discretion in not sentencing him to probation or periodic imprisonment. However, the trial judge also had those facts before him and through his observation of the trial and the hearing in aggravation and mitigation is in a superior position to decide the question of punishment. *People v. Tobe*, 49 Ill. 2d 538, 276 N.E.2d 294.

The granting of probation was within the discretion of the trial judge. His determination is subject to review only to the extent of ascertaining whether he did, in fact, exercise discretion or whether he acted in an arbitrary manner in denying probation. (*People v. Saiken*, 49 Ill. 2d 504, 275 N.E.2d 381.) Notwithstanding the mitigating factors, the fact remains that armed with a gun, defendant took the life of another. Given the violent nature of the crime committed (three shots, one in the back, using dum-dum bullets), we do not believe the trial court acted arbitrarily in denying probation. *People v. Vincson*, 15 Ill. App. 3d 934, 305 N.E.2d 671.

■■ The sentence is well within the limits prescribed by the Legislature for voluntary manslaughter. (Ill. Rev. Stat. 1973, ch. 38, pars. 9—2, 1005—8—1.) Under the circumstances of this case, we cannot say the sentence imposed is disproportionate to the crime charged. *People v. Miller*, 33 Ill. 2d 439, 211 N.E.2d 708.

For the foregoing reasons, the judgment and sentence are affirmed.

Judgment affirmed.

HAYES and DOWNING, JJ., concur.