THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES MOORE, Defendant-Appellant.

First District (3rd Division)   No. 60637

Opinion filed October 21, 1976.

David C. Thomas and Kathleen J. Hittle, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Joan S. Cherry, and R. Burke Kinnaird, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Defendant, James Moore, was charged with voluntary manslaughter. A jury in the circuit court of Cook County found him guilty of that crime and the court sentenced him to one to three years. On appeal defendant contends that the trial court erroneously refused to give a certain instruction to the jury, and that he was not proved guilty of the crime beyond a reasonable doubt.

On August 26, 1973, Phillip Taylor was shot and killed in the alley behind defendant's home in the City of Chicago. Defendant admits that he shot the decedent, but claims that he acted in self-defense. Up until a few minutes before the shooting occurred, the facts are substantially uncontroverted.

Decedent lived with his sister and Robert King. On the evening in question, decedent and Robert King had been drinking beer. At about 8 p.m., the two men were looking for John King, Robert's brother. When they were unable to locate John, they drove down the alley and met Neil Huff and defendant, who lived a few doors from John. The four men purchased some beer and returned to the alley. Defendant watched while the other three men played cards for about two hours on the hood of Robert King's auto. The decedent and one of the other card players began to argue and, when defendant intervened, the decedent told him to mind his own business.

Shortly after that argument, defendant stated that he had a gun. The decedent bet him that he did not have it with him. Defendant insisted that he did, but did not produce the weapon. Decedent then began to quarrel with defendant about a fight the pair had engaged in several years before. The decedent claimed that defendant had struck him over the head with a baseball bat, and he threatened to beat up the defendant. When the quarrel subsided, defendant left to get more beer. The others continued to play cards.

At about 10:30 p.m., defendant returned with the beer. He and decedent quarrelled again about the brand of beer defendant had purchased. Defendant joined the card game for a few hands, but then

went into his house for his gun. He returned with the gun handle protruding slightly from his pocket.

Defendant and decedent engaged in another argument. The decedent, 5 feet 10 inches and weighing 187 pounds, pushed defendant, 5 feet 5 inches and 120 pounds, up against the garage, and told defendant that he would beat him. At this point, contradictory testimony was adduced.

Robert King testified for the State that he did not see the decedent strike defendant. The witness pinned decedent's arms to his sides and held him against a fence. Robert King succeeded in dragging the decedent about 15 feet westward down the alley and away from defendant. Robert King further testified that the decedent broke away from him and started walking toward defendant saying he was going to whip him. When decedent was four or five feet from defendant, the latter shot him. In his statement to the police, Robert King stated that the decedent was running toward defendant. He explained at trial that it could have appeared that defendant was running. When the decedent fell to the ground, defendant ran away. The witness summoned the police.

John King testified that at approximately 10:30 p.m. defendant's wife came to his house to ask him to break up a fight in the alley. She said that defendant had a gun. Hearing a shot, the witness, his wife, and defendant's wife ran out. Defendant's wife ran home, while John King and his wife proceeded directly to the alley. As he entered the alley on the east side of the garage, John King saw defendant standing two or three steps from the alley. Defendant was holding a gun with his right hand as he ejected a shell with the left hand. John King told the defendant to take the gun and go upstairs. Defendant refused, replying profanely that he would shoot the decedent if the latter came near him. From that vantage point John was unable to see decedent. He entered the alley and saw his brother holding the decedent. When the decedent broke loose from Robert, the witness attempted unsuccessfully to grab him. His wife Jean also tried to grab decedent but was unable to get a firm grip on him. Decedent ran toward defendant who was standing in the east gangway. Defendant shot decedent and immediately left the scene.

Officer Rocco Colucci of the Chicago Police Department testified that he found the decedent lying near the garbage cans close to the gangway on the west side of the garage.

Neil Huff testified for the defense that after decedent pushed defendant against the garage he grabbed defendant by the collar and slapped him in the face. Defendant, in attempting to back away, stumbled and fell. Decedent grabbed defendant's right arm, twisting it, and again struck defendant. Robert King then grabbed the decedent from behind and pulled him away. Decedent attempted to break away, and stated that if defendant had a gun he should show it. Defendant replied that he had a

gun but that the decedent should leave him alone because he did not want to fight. Huff further testified that the decedent again tried to pull away from Robert King when defendant fired his gun in the air. After firing that shot, defendant put the gun in his back pocket and started to walk away. After the first shot was fired, defendant's wife ran out. Defendant sent her to get John King. Robert King was still holding the decedent when John and Jean King entered the alley. The three Kings were attempting to hold the decedent, and they were 50 feet from defendant. Defendant had turned to explain to his wife what had happened. Huff testified further that decedent broke away from the Kings and came running towards defendant. Decedent's arms were in the air, and he was saying, "You are going to have to shoot me." When defendant's wife called out, defendant turned around and shot the decedent. Decedent collapsed two or three feet from defendant. Huff left the scene immediately and never told this story to the police or to anyone else prior to testifying at trial. Throughout the affray, Huff was standing five or six feet from the defendant. Huff described the gun as a .25-caliber automatic, but was unable to state in which hand defendant held the gun, which hand he used to return it to his pocket, or in which back pocket defendant placed the gun.

Carrie Ann Moore, defendant's wife, was sitting on her front porch when she heard the decedent shout, "I am going to make you shoot me." She placed her baby in a crib and ran into the alley. She saw the decedent slap her husband. Defendant told her to get John and Jean King. As she did so, she heard a shot. She ran home and called up to her children. She then went to the alley and saw the decedent break away from Robert King and run toward the defendant. She called out a warning to defendant. Defendant turned and asked the decedent to leave him alone. When the decedent lunged, defendant shot him. Immediately after the shooting, the decedent said that defendant would be sorry for what he had done. It all happened so fast that she was unable to say how far decedent was from defendant when the shooting occurred. Defendant left home and Mrs. Moore did not see him until two days later. When he returned, she accompanied him to the police station.

Defendant testified that seven years before the shooting he had cut his right wrist so severely that he was unable to grip items or make a fist. Since the injury he wore a wrist band. Defendant further testified that when he returned to the alley with his gun, the decedent stated that he still had it in for him. Decedent struck him and knocked him down. When defendant arose, the decedent twisted his arm and struck him again. When defendant asked to be let alone, the decedent replied that he would make defendant shoot him. As Robert King pulled the decedent away, defendant drew his gun, released the safety, and fired one shot. Defendant then placed the gun back in his pocket, and started to walk

home. Looking over his shoulder, he saw the decedent break away from Robert King. At that moment John King entered the alley, grabbed the decedent, and pushed him against a fence 35 feet away. Defendant continued walking home. His wife cried out, and he turned to see the decedent running toward him. Defendant asked the decedent to leave him alone. The decedent replied that he would make the defendant shoot him. When the decedent was three feet away, defendant shot him. Defendant became scared and ran. He drove to West Virginia to see his sisters. He returned two days later and turned himself in to the police on the following day.

The defense presented evidence showing the presence of 159 milligrams of alcohol in the blood sample taken from the body of the decedent. Dr. George Christopoulos testified that the presence of 150 milligrams or more created a presumption that the individual was intoxicated.

Jean King testified for the State in rebuttal that during the previous two years she had ridden on a motorcycle with defendant. On each occasion, defendant had been driving.

John King testified in rebuttal that he had seen defendant drive a motorcycle one month prior to the shooting. The witness had also worked on vehicles with defendant within two weeks of the shooting. The work which they performed was of the type that required the use of both hands. John King further testified that as he approached the defendant in the gangway he told defendant if he took the gun into the house that the deceased probably would go home. Defendant refused. He told King that he would shoot the decedent if he came near him.

■■ We initially shall consider the issue of whether the State failed to prove defendant guilty of voluntary manslaughter beyond a reasonable doubt. Defendant asserts that the evidence adduced at trial supported his theory of self-defense.

Illinois statute defines self-defense in pertinent part as follows:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, * * *." (Ill. Rev. Stat. 1973, ch. 38, par. 7—1.)

One does not have to retreat from a place where he has a right to be. However, the nonaggressor may use force likely to cause death or serious bodily harm only if he reasonably believes that the imminently threatened force has placed him in danger of death or great bodily harm. (*People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681.) The State bears the

burden of proving the defendant guilty beyond a reasonable doubt as to the issue of self-defense and all the elements of the offense charged. (*People v. Williams.*) The test in determining self-defense is one of reasonableness. (*People v. Johnson* (1954), 2 Ill. 2d 165, 117 N.E.2d 91.) Whether the facts and circumstances would induce a reasonable apprehension of serious bodily harm is a question of fact for a jury to determine in light of defendant's perception of the situation at the time he employed deadly force against his aggressor. *People v. Kelly* (1975), 24 Ill. App. 3d 1018, 322 N.E.2d 527.

■■ In our judgment, the jury was justified in holding that defendant was unreasonable in his anticipation of death or serious bodily harm and that, therefore, his employment of deadly force was not justified and he was guilty of voluntary manslaughter.

■■ The decedent was an unarmed man, surrounded by persons who had endeavored, although unsuccessfully, to end the argument. Decedent also faced what he knew was a loaded gun. Moreover, the testimony of John King, which was apparently accepted by the jury, is crucial. He testified that he entered the alley just after the first shot was fired. He saw defendant in the east gangway ejecting a shell. At that time, King's brother was holding the decedent some 50 feet away. King told defendant to take his gun and go upstairs. Defendant refused and stated his intention to shoot and kill the decedent if he came near him. Defendant's statement was not the remark of a person possessed of a reasonable belief that he was in imminent danger of suffering serious harm. Rather it amounted to a threat to use unneeded deadly force, and demonstrated a readiness for an encounter with the decedent.

Defendant maintains that his considerably smaller size, his crippled right hand, the decedent's use of physical force against him, and the failure of the others to restrain the decedent provided the requisite justification for his use of deadly force in self-defense.

■■ The significance of the difference in size between the two men is diminished considerably by the facts that defendant was armed, and that the decedent was unarmed and was aware that defendant was carrying a loaded gun. As to defendant's crippled right hand, the State introduced considerable evidence that defendant had full use of the hand right up to the time of the shooting. Considering the evidence the State adduced in opposition to defendant's claim that he could not use the hand, the jury had ample grounds to conclude that defendant was not incapacitated as a result of his prior hand injury.

■■ The testimony was in dispute as to whether the decedent had struck defendant prior to the shooting. Robert King testified that the decedent had merely shoved defendant, and stated that he did not see decedent strike defendant. Defendant, his wife, and Neil Huff all testified that the decedent twisted defendant's arm, struck him several times, and

knocked him down. The jury had the opportunity to view the demeanor of the witnesses and to weigh their testimony. It was for the jury to determine which witnesses were telling the truth. (*People v. Horton* (1954), 4 Ill. 2d 176, 122 N.E.2d 214). The defendant, however, points out that it was not necessary for him to have suffered a beating before it would be reasonable for him to believe that decedent would inflict serious bodily harm upon him. (*People v. Dowdy* (1974), 21 Ill. App. 3d 821, 316 N.E.2d 33). Whether or not the jury concluded that the decedent had struck defendant, it remained within their province, as they did, to determine that deadly force was unjustifiable under these circumstances.

■■ The jury also had the right to consider defendant's flight to West Virginia as consciousness on his part of guilt. (*People v. Harris* (1972), 52 Ill. 2d 558, 288 N.E.2d 385.) We conclude that defendant was proved guilty of voluntary manslaughter beyond a reasonable doubt.

■■ We consider next defendant's contention that the trial court committed reversible error in refusing to give the following instruction tendered by defendant:

> "When the defendant is not the first assailant and is in a place where he has a lawful right to be and is put in apparent danger of his life or of suffering great bodily harm, he need not attempt to escape but may lawfully stand his ground and meet force with force even to the taking of the assailant's life."

The trial court did give to the jury Illinois Pattern Instruction No. 24.06 dealing with self-defense.

The simple answer to defendant's contention is that the tendered instruction was inaccurate and misleading. While a nonaggressor is not required to retreat from a place where he has the right to be (*People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681), a nonaggressor is justified in using deadly force only if he reasonably believes that the anticipated harm is imminent and capable of causing death or great bodily harm. The instruction in question failed to mention the vital requirement of imminence. Instead of "imminent" the instruction defines the danger as "apparent." This was improper. The trial court was under no obligation to rewrite the tendered instruction so that it would not be misleading. (*People v. Moorelander* (1962), 25 Ill. 2d 309, 185 N.E.2d 166.) Moreover, the jury in the present case was given the IPI instruction on self-defense. The trial court did not err in refusing defendant's proffered instruction.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

MEJDA, P. J., and McGLOON, J., concur.