THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
SALLY ESTES, Defendant-Appellant.

Third District    No. 3—83—0453

Opinion filed September 13, 1984.

HEIPLE, J., dissenting.

Robert J. Agostinelli and Jean Herigodt, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and John M. Wood, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Following a jury trial in the circuit court of Will County, the defendant, Sally Estes, was convicted of the offense of voluntary manslaughter (Ill. Rev. Stat. 1981, ch. 38, par. 9—2). Subsequently, she was sentenced to a term of four years' probation with the condition that she serve a term of six months in the Will County jail.

On appeal, the defendant raises three issues: (1) whether the State proved beyond a reasonable doubt that she did not act in self defense; (2) whether the prosecutor's remarks during closing argument deprived her of a fair trial; and (3) whether the trial court erred in refusing to give the second paragraph of the circumstantial evidence jury instruction.

Prior to considering the issues raised by the defendant, it is necessary to review the relevant facts. The victim in the instant case was Floyd Estes, the defendant's husband, a 6-foot-tall, 200-pound crane operator. He and the defendant were married February 23, 1980.

Witnesses for the State included Josephine Prock, who had known the defendant between 25 and 30 years. She testified that at approximately 11 on the morning of January 22, 1982, she received a telephone call from the defendant. During that phone conversation, the defendant told her that Floyd had come home and started a fight with her and then left, and that she was scared and wanted to leave. Mrs. Prock testified that she told the defendant that she could not get her until 5 p.m. because she would not have a car until then, but that the defendant should leave her home and go to a neighbor's or to a restaurant and she would come and get her. According to the witness, the defendant "sounded scared" at the time of the call.

Josephine Prock further testified that she received another telephone call from the defendant, later that day, between 1 and 1:15 p.m. At this time the defendant told her that she was still nervous but that she had gotten the green car started and she was going to leave. According to Mrs. Prock, at this time the defendant was "nervous and scared." She thought that the defendant was coming to her house.

Finally, Josephine Prock testified regarding a third telephone call, which she made to defendant, between 2:30 and 3 p.m. that same day. She said that a police officer answered but that the defendant was eventually put on the line.

Other witnesses for the State included Frank Lyons, Wilmington police chief, who testified that on the date in question he had received a call from the defendant stating that she had just shot her husband and requesting assistance. Chief Lyons was the first on the scene. Chief Lyons testified that the defendant told him that her husband had come home, seen tracks in the driveway, and accused her of having an affair. An argument ensued and he choked her, pulled her hair, and knocked her glasses off. On cross-examination, he described the defendant's emotional condition as "emotional hyper" and indicated that in his written report he had used the term "hysterical."

Also testifying was Ronald Pruss, Will County deputy sheriff. Deputy Sheriff Pruss' testimony laid the foundation for the introduction into evidence of the tape of the telephone call made by the defendant to the police. Much of the taped conversation is rather confused; however, it contains this statement by the defendant: "He was trying to kill me. Oh no. Call my mother. Call my mother. Please, call my mother."

Deputy Sheriff Pruss testified concerning the physical evidence at the scene as well. He indicated that a pair of glasses with very thick lenses belonging to the defendant, with strands of hair attached to

the earpieces, were found on top of the stove in the kitchen. He also identified photographs of the defendant, taken on January 22, 1982, showing redness or abrasions around the cheek, nose, and neck and left hand.

Finally, James Fetzner, investigator for the Will County Sheriff's Department, testified for the State. He testified that after he and another investigator arrived at the defendant's home, he conducted an interrogation of the defendant, the transcript of which was admitted into evidence. According to Investigator Fetzner, he advised the defendant of her rights and she agreed to an interview, but she refused to sign the written form because she could not read it without her glasses.

Investigator Fetzner further testified that the defendant told him that her husband had arrived home at 9:45 or 9:50 on the morning in question. While they were drinking and talking, her husband accused the defendant of having an affair because there were tire tracks in the driveway. After making these accusations, her husband shoved her and pulled her hair and then left. According to Fetzner, the defendant also told him that later that day her husband returned when she was in the other car and leaving. She told her husband that she was going to get cigarettes, then got her car stuck, and she returned to the house. According to Fetzner, the defendant said that, once in the house, her husband started on her family again, knocked her glasses off, and she shot him. Investigator Fetzner indicated on cross-examination that his testimony was a "more or less edited version" of what the defendant had said during the interview.

Also, on cross-examination, Investigator Fetzner testified that the defendant had told him that she was afraid of her husband and that on Thanksgiving, when they had another argument, he had knocked her down, breaking her tailbone. According to Fetzner, the defendant described the pain from her broken tailbone as the worst she had ever had and stated that she continued to have pain from the injury. At the time of this incident, the defendant's husband took her to the hospital, but told her that he had a gun in his pocket and threatened to harm her again if she told anyone how it happened. Fetzner also indicated that his partner had recovered a loaded gun from the victim's car. He described the victim as "stocky," weighing approximately 200 pounds.

The taped interview, which was played for the jury, revealed that on prior occasions, the defendant's husband had "taken a belt" to her, leaving bruises which were still there, and kicked her in the stomach. She had previously left him. She also stated that she loved her hus-

band and that he sometimes gave her a "hard time" and was "very jealous."

Also on cross-examination, the following quotation, from interview transcript, was read by the investigator to the jury:

"Yeah, and he hated that, I was in fear the rest is dashes. I couldn't do anything right, I guess and he pulled back up and he came, as I came in before he did and he started on me and he started on my family like he usually did. I wanted to stop him. He wouldn't stop and he was coming for me again and the last time he came for me, I wound up in the hospital with a broken talk [sic] bone and I had the gun in my pocket because when I came in the house I got the gun and I put it in my pocket and I just wanted to scare him."

The taped interview revealed that the defendant was describing the events which occurred after she had begun heading north in her car and met her husband heading south in his. He pulled in front of her, she got out and said that she was going for cigarettes, then tried to back her car up and slid and got stuck.

Additionally, Investigator Fetzner identified a pair of torn jeans as those that the defendant was wearing on the day in question.

For the defense, Mark Surman testified that he was a neighbor of Sally and Floyd Estes. He described the victim as a stout man who, when he was not drinking, was "not a bad guy" but who was "unruly" when he was drinking. Surman further indicated that he could not get along with Floyd Estes when he was drinking and that he "just got away from him." Surman testified that, on the day in question, the defendant came over to his house without her glasses on, wearing a pair of torn jeans with part of her back end sticking out, and asked for his help. According to the witness, the defendant's neck seemed to be "blood shot" or bruised and her hair was "all bushed out," not the way she normally looked.

Mary Vaira also testified as a witness for the defense. She indicated that she and the defendant had taken a nurse's aid training course together. She described the victim as "very boisterous" and "very obnoxious" when he had been drinking. She testified that on December 5, 1981, she and her husband had gone to the home of the defendant. According to the witness, Floyd Estes appeared to be drinking and very abusive and the defendant was acting very nervous and scared. During the course of the visit, Floyd Estes told the witness that he supposed that the defendant had opened her big mouth and told her that he had broken her tailbone.

The defendant also testified at trial. According to the defendant,

on Thanksgiving Day, 1981, she was at home making turkey dinner when the defendant, who had been drinking and was in a bad mood, left. He returned a few hours later and informed her that he was tired of her big mouth, her lies and her family and friends and that they were going to get a divorce. He then became violent, ripped her blouse off, pushed her around, and pushed her onto the kitchen floor. She suffered a broken tailbone as a result.

On the way to the hospital, Floyd Estes took a gun out of a Kleenex box in his car, put it in his pocket, and told defendant that if she said anything to anyone about what had happened he would kill her. At the hospital, the defendant told the emergency room personnel that she had slipped and fallen on grease. Her injury caused a sharp stabbing pain and required her to miss work between three and four weeks. Three days after her injury, she was hospitalized for three days.

The defendant further testified that on January 22, 1982, her husband returned home from work between 9:45 and 10 a.m. He walked in the house with a can of beer in his hand and was complaining about the hedge in front of their house and the tracks in the snow. According to the defendant, her husband accused her of having someone at the house. She attempted to calm him down, denying that anyone had been there, but he would not believe her and it got worse. According to the defendant, her husband called her a lot of names and then came at her and they started to physically fight.

The defendant testified that her husband got her down on the kitchen floor, pulled her hair, and tried to choke her, twisting her neck with his hands. The defendant managed to get away from him and he left, still yelling. She stated that she was in pain, very frightened, and extremely upset. According to the defendant, she knew that she had to leave but was not able to handle a car in the state she was in, so she called Josephine Prock.

Later, she scraped the car window and started driving north. Her husband approached in his car and blocked her so that she could not get by him on either side. She attempted to back the car around but it became stuck. According to the defendant, at this point she knew she was "in trouble" and went back into the house. She then went into the bedroom and got a gun from under the mattress, kept there for protection because her husband worked nights. She put it in her coat pocket and went into the kitchen.

According to the defendant, her husband came into the kitchen and started yelling about the car and calling her names. She was afraid of him and thought that he may have brought the gun in from

the car. They struggled and he slapped her face, knocking her glasses off. He got her down on the floor again and she got away from him, went and sat down in a chair by the door, and begged him to leave her alone.

The defendant testified that her husband came after her and she pulled out the gun and shot him. According to the defendant, she was hysterical and in pain, and feared that he could kill her. Specifically, she was afraid that he had come in with a gun, or that he would choke her or break her neck.

She put the gun down and "fell on" her husband, then called the police. Afterward, she ran next door, asking her neighbor, Mark Surman, to help. He returned to her house with her and the police arrived.

Additionally, it was stipulated by the parties that the defendant's vision was 20/20 in both eyes with her glasses and 20/400 without them. It was also stipulated that an optometrist would testify that the defendant could see movement but not distinguish the features of a full-grown man three feet away, without her glasses. It was also stipulated that at noon on January 23, 1982, a blood specimen taken from the body of Floyd Estes had an ethanol count of .139% and the urine, .220%. Finally, it was stipulated that the physician who had examined Sally Estes on Thanksgiving Day, 1981, would testify that she had a fractured coccyx (tailbone).

On rebuttal, Josephine Prock testified for the State that in December 1981 the defendant wrestled with her 16-year-old son but that he did not wrestle back because of her broken tailbone and that, later that same day, the defendant danced at the V.F.W. On cross-examination, Mrs. Prock admitted that she no longer saw the defendant because her husband had filed a lawsuit against her.

Turning now to the issues raised by the defendant, we shall consider the alleged error as to jury instructions first. With respect to this issue, it is the defendant's contention that the State produced no direct evidence to meet its burden of disproving the defendant's claim of self-defense.

■ It is well established that both paragraphs of the circumstantial-evidence jury instruction should be given only when all the evidence is entirely circumstantial. (*People v. Minish* (1974), 19 Ill. App. 3d 603, 312 N.E.2d 49; Illinois Pattern Jury Instruction, Criminal, No. 3.02 (1968).) We do not find sufficient merit in the defendant's contention to warrant a lengthy discussion, but simply rule that the trial court correctly refused defendant's request to give both paragraphs of the circumstantial-evidence jury instruction, because the

defendant's testimony constituted direct evidence in the instant case.

We consider next the question of whether certain remarks of the prosecutor made during closing argument operated to deny the defendant a fair trial. We find considerably more merit to this contention of the defendant and rule that those remarks, taken together, constituted substantial prejudice to the defendant, the ultimate result of which was the denial of her right to a fair trial.

In reaching this conclusion, we address first the argument of the State that the defendant has waived this issue by failing to object at trial and by failing to make the objection with sufficient specificity in her post-trial motion. While we agree with the State that only one objection was interposed by the defense during closing argument and that the statement of the issue in the post-trial motion was too general, we elect to consider the issue under the doctrine of plain error. *People v. Crossno* (1981), 93 Ill. App. 3d 808, 824, 417 N.E.2d 817, 838.

In raising this issue, defendant attacks several different aspects of the prosecutor's closing argument. One error, according to the defendant, occurred when the prosecutor argued to the jury that the defendant failed to retreat. A review of the record reveals that not only did the prosecutor raise the question of retreat in closing argument but he also questioned the defendant, on cross-examination, as to whether she had attempted to leave. Placing the suggestion before the jury that the defendant had a duty to retreat is a clear misstatement of Illinois law and could well have substantially influenced the determination of the jury. The accurate statement of the law on this point is that a nonaggressor is not required to retreat from a place where he has a right to be and may use force likely to cause death or serious bodily harm if he reasonably believes that he himself is in danger of death or great bodily harm. *People v. Moore* (1976), 43 Ill. App. 3d 521, 526-28, 357 N.E.2d 566, 570-71.

The defendant also urges as error the prosecutor's statement to the jury during closing argument that the defendant's prior experiences, including her broken tailbone and being threatened with a gun, did not "count." We agree with the defendant that this is not a correct statement of Illinois law. Both the evidence of the violent disposition of the deceased and threats directed at the defendant by the deceased have been held to have probative value in establishing that the defendant reasonably believed that the use of force likely to cause death or great bodily harm was necessary to prevent the killing or infliction of great bodily harm upon the defendant. *People v. Shipp* (1977), 52 Ill. App. 3d 470, 367 N.E.2d 966, 970.

■ In addition to these misstatements of Illinois law, the defendant also raises the injection of inflammatory and irrelevant remarks into the prosecutor's closing argument as sources of error. Specifically, in his rebuttal argument, the prosecutor stated:

"And another thing that we have to get up front is what are we talking about in this case. We are talking about a situation where a woman has killed her husband. We are talking about a situation where she's shot him in the chest with a gun and the defendant wants you to justify the taking—her taking of a human life, she wants you to condone her for it. She wants you to resolve [*sic*] her and find her not guilty. She wants you to tell her that she has a right to take a life."

Here, the prosecutor's suggestion to the jury that a finding that the defendant had acted legally in self-defense was equivalent to morally condoning the act was clearly prejudicial and outside of the bounds of fair comment. It is well established that it is improper for a prosecutor to say anything in argument the only effect of which is to arouse the prejudice and passion of the jury against the defendant without shedding any light on the paramount question presented to the jury. *People v. Crossno* (1981), 93 Ill. App. 3d 808, 821, 417 N.E.2d 827, 838; *People v. Lurry* (1979), 77 Ill. App. 3d 108, 114, 395 N.E.2d 1234, 1238.

The defendant also argues that the prosecutor improperly injected into his closing argument irrelevant comments about the crime of murder, *i.e.*, "Well, one thing we know and I want you to keep in mind first of all is that Mrs. Estes is not charged with murder." According to the defendant, the prosecutor made this irrelevant observation to suggest to the jury that the defendant had already been given a break by being charged with a lesser offense. We agree with the defendant that an obvious purpose for this irrelevant comment would be to minimize the significance of finding the defendant guilty of the crime charged.

The test for determining whether the remarks of the prosecutor in closing argument constitute reversible error is whether those comments were such that, without their having been made, the jury might have reached a different result. (*People v. Barnes* (1983), 117 Ill. App. 3d 965, 978, 453 N.E.2d 1371, 1382.) Furthermore, although a single error alone might be considered harmless, the combined effect of the several errors is not harmless. In the instant case we find that, taken together, the prejudicial effect of the errors discussed above to be substantial.

As a final point within this issue, the defendant contends that the

prosecutor improperly expressed his own opinion on the ultimate issue of the case. Although we agree that the prosecutor improperly expressed his personal belief with regard to the guilt or innocence of the defendant (*People v. Pearson* (1972), 2 Ill. App. 3d 861, 277 N.E.2d 544; *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 108, 289 N.E.2d 256, 260), we do not find the error in the comments complained of to be of the same magnitude of those discussed above. While in no way condoning the prosecutor's expression of his personal opinion as to the ultimate issue in the case, we nonetheless decline to find that it had the same measure of seriousness as those remarks discussed above.

Finally, we turn to the third issue raised by the defendant: whether the State proved beyond a reasonable doubt that the defendant did not act in self-defense. With respect to this issue, we note initially that self-defense is an affirmative defense and, once it has been raised, the State has the burden of disproving it beyond a reasonable doubt. (*People v. Lester* (1981), 102 Ill. App. 3d 761, 766, 430 N.E.2d 358, 362.) The test to be applied is whether the facts and circumstances would induce a reasonable apprehension of serious bodily harm in light of the defendant's perception of the situation at the time he employed force against his aggressor. *People v. Moore* (1976), 43 Ill. App. 3d 521, 527, 357 N.E.2d 566, 570.

Although whether a killing is justified under the law of self-defense is always a question of fact to be determined by the trier of fact and will not be lightly set aside, a court of review has a duty to carefully review the evidence and to reverse the conviction of the defendant when the evidence is so unsatisfactory as to raise a serious doubt as to the defendant's guilt. (*People v. Reeves* (1977), 47 Ill. App. 3d 406, 410, 362 N.E.2d 9, 13.) The defendant need only to have subjectively believed that she was in danger of losing her life or suffering great bodily harm to be justified in using deadly force, and where she claims that she acted in self-defense, it is sufficient to acquit her if all of the evidence in the case, taken together, creates a reasonable doubt as to her guilt. *People v. Goodman* (1979), 77 Ill. App. 3d 569, 574-75, 396 N.E.2d 274, 278.

To the defendant's charge that the State failed to prove beyond a reasonable doubt that the defendant did not act in self-defense, the State responds with several arguments. One argument made by the State is that, because the decedent was not armed, the defendant's use of deadly force was not justified. A related point of dispute is whether the defendant knew that the deceased was not armed.

■ With respect to this issue, we agree with the defendant that the law does not require that the aggressor be armed in order that

the use of a deadly weapon in self-defense be justified. (*People v. White* (1980), 87 Ill. App 3d 321, 323, 409 N.E.2d 73, 75; *People v. Lester* (1981), 102 Ill. App. 3d 761, 767, 430 N.E.2d 358, 362.) Where it is clear that the aggressor is capable of inflicting serious bodily harm on the defendant without the use of a deadly weapon, and it appears that he intends to, then it is not necessary that the aggressor be armed for the defendant to employ deadly force in self-defense. In the instant case, the deceased had previously inflicted serious bodily harm on the defendant without the use of a weapon.

As to whether or not the defendant knew that the deceased was not armed, the State argues that, because the deceased did not have a coat on, he could not have concealed a weapon on his person. The defendant responds that there are other ways to conceal a weapon on a person when that weapon is of a size which can be kept in a Kleenex box.

With respect to this question, it appears to be undisputed that, without her glasses, the defendant's vision was extremely limited. We also note that a loaded weapon was in fact found in the car from which the deceased exited, the same weapon with which he had previously threatened the defendant after breaking her tailbone.

Next the State argues that the defendant could have fended off the assault by threatening to shoot her husband or by warning him. Thus, the State argues, the defendant's belief that the use of force in self-defense was necessary was unreasonable. The defendant admits that she did not warn or threaten the deceased; she testified that she did, however, go sit down in a chair and beg him to leave her alone. It was only when he came after her again that she shot him. Further, the evidence indicates that the shooting took place at extremely close range.

With respect to this question, we find the observations of the court in *People v. White* (1980), 87 Ill. App. 3d 321, 409 N.E.2d 73, to be particularly instructive. That court observed:

"When one is threatened by a person who carried out his threats on a previous occasion, he does not have much time to reason out his response or judge precisely how much force is necessary to repel the threatened attack. While it is true he cannot take the law into his own hands, we must bear in mind that a person placed in such a position is not in a contest governed by established rules enforced by an on-the-scene umpire. [Citation.] Consequently, the law does not charge a person, when he has reasonable grounds to believe himself in apparent danger of losing his life or suffering great bodily injury, to use

inerrable judgment. It would be unreasonable to require such an exacting decision to be made in the space of a few seconds while one is fearful and under great stress. [Citation.]

The question in a case such as this is whether on the basis of quickly unfolding events the defendant's response was reasonable under the exigencies that existed at the moment. In this regard, the right of self-defense arises before the first blood is drawn. [Citation.]" (*People v. White* (1980), 87 Ill. App. 3d 321, 323, 409 N.E.2d 73, 75.)

The *White* court reversed the defendant's conviction for voluntary manslaughter, following a bench trial, finding that the State had failed to prove beyond a reasonable doubt that the defendant was not acting in self-defense at the time he shot the victim.

Additionally, the State argues that, because a burned-out cigarette was found near the deceased's hand by the police, it is possible to infer that he was holding a cigarette at the time he was shot and that smoking a cigarette was not consistent with the attack on the defendant. In response, the defendant points to her testimony at trial regarding her husband's habit of putting down his cigarette on the stove or countertop in the kitchen and forgetting it, so that it rolled on the floor and burned itself out.

The State further argues that the defendant's credibility regarding the intensity of the struggle which took place in the kitchen is questionable because only a sugar bowl was broken. The defendant responds that most of the fight took place on the floor.

Finally, the State points out that the evidence of the defendant's physical injuries shows marks only on one side of her throat. The defendant responds, relying on forensic experts for authority, that marks on one side of the throat are not inconsistent with choking and that it is wholly possible for choking not to leave any marks at all.

We conclude that these arguments made by the State as to the physical evidence are not sufficiently convincing to elevate the State's proof that the defendant did not act in self-defense to the status of beyond a reasonable doubt. In general, those arguments may be fairly characterized as speculative and even the argument regarding the cigarette found near the deceased, which we regard as the least unconvincing, cannot be accurately described as disproving the defendant's testimony that she acted in self-defense beyond a reasonable doubt.

As we indicated previously, where the record on appeal leaves a grave and substantial doubt as to the guilt of the defendant, the judgment of the trial court will be reversed. (*People v. Shipp* (1977), 52 Ill. App. 3d 470, 475, 367 N.E.2d 966, 970.) In the instant case,

under the circumstances, considering all the evidence, we cannot say that the defendant's belief that she was in danger of death or great bodily harm was unreasonable beyond a reasonable doubt.

During the pendency of this appeal, the defendant sought and was granted leave to file a supplemental brief raising the following issue: whether the trial court abused its discretion by denying her request to supplement the court's *voir dire* with a question pertaining to the State's burden of proving its case beyond a reasonable doubt.

In her brief, the defendant principally relies on our supreme court's recent decision in *People v. Zehr* (1984), 103 Ill. 2d 472, in which the trial court's refusal to ask, on *voir dire*, certain questions tendered by defense counsel was held to be error. According to the defendant, the questions refused by the trial court in *Zehr*, like the question refused in the instant case, "probed the jurors' bias or prejudice regarding the defendant's presumption of innocence and the State's burden of proving guilt beyond a reasonable doubt."

At issue in this case is defense counsel's request that the court question each juror individually to assure that he or she would adhere to the principle that the State carries the burden of proving the defendant guilty beyond a reasonable doubt. In *Zehr*, these questions were found to have been erroneously refused by the trial court:

> "1. If at the close of all the evidence and after you have heard arguments of counsel you believe that the State has failed to sustain the burden of proof and has failed to prove the defendant guilty beyond a reasonable doubt, would you have any hesitation whatsoever in returning a verdict of Not Guilty?
>
> 2. If the defendant, Mr. Zehr, decides not to testify in his own behalf, would you hold it against him?
>
> 3. Do you understand that the defendant is presumed innocent and does not have to offer any evidence in his own behalf, but must be proven guilty beyond a reasonable doubt by the State?"

In contrast, in the instant case no similar questions were submitted. Rather, at the court's invitation to counsel to submit additional questions, defense counsel merely suggested:

> "Your Honor, there is only one question that I was under the impression that would be asked and that is that there is specifically charged with the burden of proof beyond a reasonable doubt and that they would decide —."

In reply to this rather generalized statement of concern expressed by defense counsel, the court indicated that the jury would be informed of the basic principles which apply in criminal cases, including the re-

quirement that the State prove its case beyond a reasonable doubt, at the time it was sworn. This concern was again reiterated by defense counsel as follows:

"Although again, I would respectfully request of the court if they could, if here again if the court could just briefly assure that each individual juror will go along with the reasonable doubt standard."

On the basis of these rather vague oral suggestions, we decline to find in the instant case a violation of the rule announced in *Zehr*. Supreme Court Rule 234 governs this question and places within the trial court's discretion the use of supplementary questions submitted by counsel for use on *voir dire*. (94 Ill. 2d R. 234.) To find that the court has committed error here, where no question was actually submitted, in our opinion pushes the *Zehr* rule too far.

Rule 234 delineates the duty of the trial court to "manage" the *voir dire* examination. For us to rule that the court erred in refusing to allow a question which was not actually submitted would be to transform the duty of the trial court into an unreasonable burden.

Nor does the only reported appellate court case applying the *Zehr* rule suggest a different result. In *People v. Britz* (1984), ___ Ill. App. 3d ___, defense counsel had submitted a list of 50 questions for the court's consideration with respect to *voir dire*. Among these 50 questions were three which the *Britz* court found to be virtually identical to those proposed in *Zehr*. In *Britz*, the trial court's refusal to propose these questions was found to be reversible error. In the instant case, we find that the question was not adequately raised by defense counsel. It is obvious, however, that, had questions similar to those in *Zehr* and *Britz* been presented to the court for use on *voir dire*, they should have been included.

No other issues having been raised by the defendant, the judgment of the circuit court of Will County is reversed.

Reversed.

SCOTT, J., concurs.

JUSTICE HEIPLE, dissenting:
I respectfully dissent from the majority of the court.

The evidence adduced at trial reveals a situation where reasonable men might disagree as to what defendant believed when she shot her husband, and whether that belief was reasonable. Questions of this sort are particularly within the province of the jury. (*People v. Aguero*

(1980), 87 Ill. App. 3d 358, 408 N.E.2d 1092.) Consequently, I am most reluctant to substitute my assessment of the record on appeal for the judgment of those who had the opportunity to observe the testimony of live witnesses. It is with this reluctance in mind that an analysis of the evidence is undertaken.

It is clear that defendant's fear of physical harm from her husband was quite reasonable. He had beaten her earlier that day. It was this fear that motivated defendant to get a loaded gun from the house. Defendant's husband proceeded to verbally and physically abuse her after entering the house. Defendant, obviously frightened, sat down in a chair near the back door. As her husband approached, she shot and killed him.

The scenario revealed by this evidence is one from which one could easily infer that defendant's fear of death or serious bodily harm was in fact reasonable. However, there is enough in the record to justify the conclusion that a reasonable doubt might not have necessarily arisen from the conflicting inferences. First, while abuse had occurred, the victim had never caused serious bodily harm to defendant. There was evidence of a fractured coccyx as a result of a fight, but the victim had merely pushed defendant down. Second, defendant went into the house, obtained a loaded gun, concealed it, and did not attempt to reveal its existence in order to repel her oncoming husband. A reasonable inference would be that defendant was lying in wait for an opportunity to use the gun as a response to an attempted beating. This form of "calculated self-defense" cannot logically be said to be a product of fear of death or serious bodily injury. Finally, the only account of the encounter came from defendant. It is quite conceivable that the jury simply did not believe either the factual account of defendant or that her testimony that she reasonably feared death or serious bodily injury. Matters of credibility are particularly within the province of the jury, especially those involving state of mind. Thus, I cannot agree that the evidence fails as a matter of law to establish guilt beyond a reasonable doubt.

The majority's citation of *People v. White* (1980), 87 Ill. App. 3d 324, 409 N.E.2d 73, is not persuasive. While we agree that one who is confronted with a person who has carried out his threats previously is entitled to a certain latitude of freedom in responding to subsequent threats, the cases are sufficiently factually dissimilar to justify distinction. There, the victim had previously attacked and cut the defendant with a knife. Furthermore, defendant knew victim to be extremely

hostile due to an earlier incident involving an accidental discharge of defendant's gun resulting in some tile fragments striking the victim. The defendant was in his own home when the victim intruded. Finally, events there occurred rather suddenly so that opportunity for reasonable assessment of possible danger was impossible. Here the most salient, uncontroverted fact in evidence is that defendant retrieved and concealed a loaded gun. Her allegedly reasonable belief that her husband was armed was unfounded and disbelieved by the jury. Thus, we believe that a reversal on the authority of *White* is not justified.

The court also finds that the prosecutor's argument to the jury constituted reversible error. Keeping in mind the standard that improper argument justified reversal only when the statements result in substantial prejudice or serve no purpose other than to inflame the jury (*People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746), an analysis reveals that no reversible error was committed. The statements cited by the majority were all clearly examples of improper argument. However, in a case such as this, it is doubtful that any substantial prejudice resulted. The issue in the case (whether defendant's belief that she was in danger of serious bodily harm or death was reasonable under the circumstances) is straightforward enough that attempts by the prosecutor to inject irrelevant or distracting matter could not sway the jurors from the fundamental question before them. It is my opinion that the jurors resolved this question in favor of the People without regard to the improper argument of counsel.

I agree that the second paragraph of the circumstantial evidence instruction was properly refused.