THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER GOOSENS, Defendant-Appellant.

First District (1st Division)    No. 1—92—0521

Opinion filed April 25, 1994.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Eric R. Lifvendahl, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial, defendant, Christopher Goosens, was found guilty of first degree murder for the shooting of Jose Feliciano

and sentenced to a term of 30 years' imprisonment. On appeal, defendant contends that: (1) his conviction should either be reversed or reduced to second degree murder because he acted in self-defense; and (2) he was denied effective assistance of counsel. For the following reasons, we affirm the judgment of the trial court.

The following facts are relevant to this appeal. At trial, Luis Santiago testified on behalf of the State that on Sunday, July 7, 1991, at approximately 4 a.m., he was standing on the corner of Mozart Street and Augusta Avenue, Chicago, along with Jose Feliciano, Curtis Collins, Alfarao (Mexico) Flores, Antonio Flores, and some women, when a black Camaro automobile slowly passed the group. Santiago stated that he and the other men were all members of the Dragons street gang, and that they recognized the Camaro as belonging to a member of their rival gang, the Latin Kings. At that point, Feliciano got into the driver's side of his gray Buick Regal automobile, and Santiago got into the passenger seat. Alfarao Flores and Melendez got into the back seat of the Buick, and they followed the Camaro. When they reached the intersection of Augusta and Humboldt Boulevard, the Camaro was in front of the Buick, and Feliciano started chasing the Camaro, until the cars were alongside each other. At that point, Santiago saw defendant, whom he recognized as Latin King member "Little Fro," in the passenger seat of the Camaro, holding a gun. Defendant began shooting the gun at the Buick, and Santiago and the others ducked down. Santiago heard two or three shots, and then the Buick crashed into a fence at Kedzie and Augusta. After they hit the fence, Santiago saw that Feliciano was bleeding from the head.

On cross-examination, Santiago testified that none of the Dragons had guns. Santiago admitted that he had been in a fight with defendant at a municipal park pool earlier in the summer and that he now hates defendant because he killed Feliciano.

Jose Melendez testified on behalf of the State to the same essential facts. In addition, he stated that his right hand was injured when the Regal crashed and that he was treated at St. Mary's Hospital. Melendez identified defendant in a lineup at the police station on July 18, 1991.

Curtis Collins testified that when the Camaro initially passed the group as they stood on the street, he called out, "Watch it there go Little Fro." Collins stated that following the shooting, Angel Ruiz transported Feliciano to Norwegian American Hospital. On July 18 1991, Collins identified defendant in a lineup at the police station.

On cross-examination, Collins stated that at approximately 2:45 a.m. on July 7, 1991, he and the other Dragons witnessed shots being fired from within a passing station wagon. A bullet hit a bystander named Camacho in the foot.

Antonio Torres testified on behalf of the State that he and Collins ran toward Sacramento when the others got into Feliciano's Buick. Torres did not see the shooting, but heard three shots, and saw the Buick crash.

Chicago police detectives Gene Harris and Dennis Keane testified that on July 7, 1991, at 4:30 a.m., they interviewed Trinidad Alamo, defendant's mother, Lydia and Martha Fernandez, defendant's sisters, and Mirta Cotto, defendant's girlfriend, at 2033 West Diversey. Cotto told the officers that she last saw defendant on July 7, 1991, at 2 a.m., and never told the officers that defendant was in Wisconsin.

Mirta Cotto testified that on July 7, 1991, at approximately midnight, she was at 2033 West Diversey with Lydia and Martha Fernandez, and Trinidad Alamo. Cotto stated that she last saw defendant at 9 p.m. on July 7, 1991, and that she spoke with police officers approximately two hours later. Cotto denied that she told the officers that she had last seen defendant at 2 a.m. on July 7, 1991. Cotto stated that defendant had told her that he might go to Wisconsin, and that she told that to the officers. Cotto stated that she thought defendant drove his Lincoln Continental to Wisconsin and returned to Chicago on a bus.

Chicago police officer Patrick Foley testified on behalf of the State that on the morning of July 7, 1991, he went to Norwegian American Hospital and interviewed Melendez about the shooting incidents that occurred at 2 a.m. and 4 a.m. Regarding the incident at 4 a.m., Melendez stated that he thought defendant was the driver of the Camaro. On cross-examination Detective Foley admitted that his interview with Melendez took place at St. Mary's Hospital, where Melendez was treated for his hand injury.

Deputy Chief Cook County Medical Examiner Dr. Robert Kirschner testified that he performed a post-mortem examination on Feliciano on July 8, 1991. Dr. Kirschner found a single gunshot wound to the left side of Feliciano's head. Dr. Kirschner stated that he found no evidence that the shot had been fired from close range, which he defined as within 18 inches. Dr. Kirschner found another gunshot injury to Feliciano's left forearm, possibly the result of the same bullet. Dr. Kirschner determined the cause of death to be a gunshot wound to the head which penetrated Feliciano's brain.

Arvey Harbin testified on behalf of defendant. Harbin stated that on July 7, 1991, at approximately 1 a.m., he was at Gory's Cat Fish Bay Resort in Wisconsin near the Wisconsin Dells. Harbin stated that he saw defendant when he went out on the deck on the way to his room. Harbin stopped and talked to defendant for a minute or

two, then the two men went to the day room and watched a movie until daylight. At daylight, Harbin and defendant went fishing out on a boat until noon.

On cross-examination, Harbin stated that he last saw defendant on July 11, 1991, when defendant left Gory's. Harbin stated that defendant did not have a car at Gory's, nor did defendant have his own fishing rod.

Next, Gregory Wyman testified on defendant's behalf. Wyman stated that on July 7, 1991, he was a maintenance worker for Gory's Cat Fish Bay. At 1 a.m. he was in the day room watching a movie. Defendant was also present. Wyman left at 3:30 a.m. and went to his cabin. He saw defendant later that afternoon walking around the grounds. On cross-examination, Wyman stated that defendant did not have a room at Gory's. Wyman further admitted that he had been drinking beer from 11 p.m. July 6, 1991, until he went to his cabin at 3:30 a.m. July 7, 1991.

Richard Hines also testified for defendant. He stated that he lives in Friendship, Wisconsin, and is in charge of firewood at Gory's. Hines stated that he saw defendant at 2 p.m. Sunday, July 7, 1991, when Robert Gory brought defendant to Hines' motor home. Gory introduced defendant as the person who had taken some firewood without paying for it. Defendant apologized for taking the wood and paid Hines $6. Hines stated that he has not seen defendant since the incident with the firewood and did not know him prior to that incident.

On cross-examination, Hines stated that he was not working at Gory's on Sunday, July 7, 1991, and that he was home on his day off from his other job at the Wisconsin Dells. Hines admitted, however, that he cannot recall what day of the week July 7, 1991, fell upon.

Darlene Martin testified that she has known defendant for three to four years. On July 7, 1991, at 4 a.m., she was at 3228 West Augusta on the front porch talking to her goddaughter when she saw a black car drive past. She saw a head sticking out of the window and saw an individual start shooting out of the car at a gray car. She stated that the individual was not the defendant.

On cross-examination, Martin stated that she did not know about defendant's arrest until two days prior to the trial. She admitted that she initially lied to investigators about what she had seen on July 7, 1991.

Defendant then testified on his own behalf. He admitted that he is a member of the Latin Kings street gang. On July 6, 1991, he was at Cookies Nightclub, where he met an individual named Jessie, whom he had known for two months. That night, Jessie drove defen-

dant to Wisconsin in his White Cadillac. Defendant stated that he had told his sister and mother that he was going to Wisconsin. He took with him a bag of clothes and a little duffel bag containing fishing gear. Jessie dropped defendant off at Gory's between 1 a.m. and 1:30 a.m. on July 7, 1991. Defendant rented a room and paid $10 for a fishing license. Defendant then put his bags in his room and went to the day room. On his way to the day room he met Harbin. When they reached the day room, Wyman was there. Defendant stayed in the day room for $3^1/_2$ hours watching a movie.

After the movie, defendant took some wood to build a fire, then left and went fishing with Harbin. Defendant stated that he had to rent a fishing pole because on the trip, a little knob on his own reel broke off and he could not find it to fix the rod. Defendant stated that he fished until noon. After that, the hotel manager confronted him regarding the firewood, and he went to Hines' trailer to pay for the wood. Defendant called his mother later that week and found out the police were looking for him. Defendant turned himself in to the police a week later. Defendant denied that he was in the black Camaro on July 7, 1991, and said he did not shoot anyone.

On cross-examination, defendant admitted that he does not know Jessie's last name, nor his address. Defendant has not seen Jessie since Jessie dropped him off in Wisconsin on July 7, 1991, and does not know how to find him. Defendant stated that he told his girlfriend, Cotto, that he was going on a fishing trip in Wisconsin several weeks prior to his trip. Defendant denied that he is known as "Little Fro" and stated that he knows nobody by that name, although he admitted that he has been mistaken for Little Fro because of his Afro-like hair. Defendant admitted that he stayed in Wisconsin for as many as 12 days, although he had only one bag of clothes and intended to stay for only a short period of time. Defendant stated that he paid for his room with $400 cash he had saved from his job working as a dishwasher.

The defense then entered the stipulated testimony of Chicago police officer Snarski. Snarski stated that on July 7, 1991, at 4:20 a.m., he received a description of the shooter as a white, male Hispanic, age 17 to 20, named Little Fro, home address unknown. The defense then rested. Following closing arguments, the trial court found defendant guilty of first degree murder.

Prior to sentencing, the trial court heard arguments on defendant's motion for a new trial. Defense counsel argued that he failed to receive, prior to trial, an inventory report pertaining to the recovery of a .25-caliber casing. Defense counsel admitted that the inventory report is described in the police reports that he did receive,

but that he mistakenly assumed that the .25-caliber casing was the same bullet described in another inventory report as a .38-caliber casing. Defendant argued that had he received the inventory report describing the .25-caliber casing prior to trial, he would have impeached State witnesses who testified that there was only one weapon, and that without the inventory report, defense counsel was prevented from presenting a self-defense theory on defendant's behalf. Defense further argued that defendant failed to receive a fair trial because defense counsel was ill with the flu and under pressure of two simultaneous criminal trials he was trying before another judge.

The State responded that the inventory report was tendered to defendant prior to trial and, in the alternative, there was sufficient evidence in other documents defendant had in his possession to put him on notice that a .25-caliber casing was recovered at 3148 West Augusta. The State further argued that the .25-caliber casing could not have come from Feliciano's car, because it was discovered at 3148 West Augusta and Feliciano's car, which was traveling westbound, crashed at 3130 West Augusta. Finally, the State argued that defense counsel presented sufficient evidence for his alibi case, including four witnesses from out of State and an eyewitness not mentioned in any police report.

Following arguments, the trial court denied defendant's motion for a new trial. The trial court stated that the evidence was not newly discovered and, in any event, was not of such a conclusive character that it would change the result at trial. Following a hearing in aggravation and mitigation, the trial court sentenced defendant to 30 years' imprisonment.

Defendant's timely appeal followed.

■ Defendant first contends that his conviction should either be reversed or reduced to second degree murder because he acted in self-defense. Defendant argues that the facts "inherently" indicate self-defense, where Feliciano was the "aggressor" chasing a car in which defendant was "allegedly" a passenger.

Self-defense is an affirmative defense, and unless the State's evidence raises the issue, the defendant must present some evidence as to each of the elements of the defense. The use of force in defense of the person is justified where (1) force had been threatened against defendant; (2) defendant was not the aggressor; (3) the danger of harm is imminent; (4) the force threatened was unlawful; (5) defendant actually believed that a danger existed, that force was necessary to avert the danger, and that the amount of force used was necessary; and (6) that the beliefs were reasonable. (*People v. Balfour* (1986), 148

Ill. App. 3d 215, 221, 498 N.E.2d 547; *People v. Kyles* (1980), 91 Ill. App. 3d 1019, 415 N.E.2d 499.) Once defendant has presented some evidence as to each of these elements, the State has the burden of disproving the defense beyond a reasonable doubt. (*People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275.) If the State negates any one of the self-defense elements beyond a reasonable doubt, it has met its burden of proof. *People v. Zolidis* (1983), 115 Ill. App. 3d 669, 450 N.E.2d 1290.

In the present case, defendant has raised the defense of self-defense for the first time in this appeal. The record reveals no evidence to support a defense of self-defense. The record shows that defendant shot a gun from a black Camaro into a gray Buick Regal, hitting Feliciano. Witnesses for the State testified that none of the occupants of the Buick had a gun or shot a gun. Defendant presented no eyewitnesses who testified that anyone shot a gun out of the Buick. The trial court determined that defense witness Darlene Martin was a liar and did not consider her testimony.

Defendant further argues that the testimony of the State's witnesses is unreliable and that they are not credible witnesses. It is the function of the trier of fact to resolve any conflict in the evidence and to determine the credibility of the witnesses. (*People v. Willis* (1991), 217 Ill. App. 3d 909, 917, 577 N.E.2d 1215.) Upon review, this court may not substitute its judgment for that of the trier of fact. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.

The record shows that the trial court considered all witnesses' backgrounds, including their prior convictions and status as rival gang members. Nevertheless, the trial court balanced the testimony and determined that the State's witnesses were more credible than the defendant's witnesses.

Defendant admits that he did not present a defense of self-defense at trial, but argues that a defendant is entitled to have the jury instructed on any defense that has foundation in the evidence. However, in the present case, the defense of self-defense has no foundation in the evidence.

■ Next, defendant contends that he is entitled to a new trial because he was denied effective assistance of counsel during his trial. Defendant claims that defense counsel was ineffective for the following reasons: (1) defense counsel admitted his own ineffectiveness in defendant's post-trial motion for a new trial when he told the court that he was (a) overburdened by a double jury trial, and (b) suffering from the flu when he was preparing for defendant's trial, which caused him to overlook evidence supporting self-defense; and (2) defense counsel admitted that he chose an ambivalent defense,

combining alibi with self-defense. In addition, defendant argues that he is entitled to a new trial because the State failed to furnish defense counsel with a firearms report during discovery.

The standard for evaluating the effectiveness of counsel was first set forth as a two-part test in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by the Illinois Supreme Court in *People v. Albanese* (1984), 104 Ill. 2d 504, 525-27, 473 N.E.2d 1246. The *Strickland* test requires that defendant first show that counsel's performance was below an objective standard of reasonableness, thus creating a constitutional deprivation. Defendant must also show that his counsel's deficient performance substantially prejudiced his defense and but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Flores* (1989), 128 Ill. 2d 66, 80-81, 538 N.E.2d 481.

In the present case, defendant asserts in his post-trial motion that defense counsel's representation may have been ineffective because, *inter alia*, defense counsel overlooked evidence supporting the defense of self-defense. Counsel's actions are usually based on informed strategic choices made by the defendant and on information supplied by the defendant (*Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066), and the fact that a trial tactic proved unsuccessful does not demonstrate incompetence. (*People v. Schmidt* (1988), 168 Ill. App. 3d 873, 522 N.E.2d 1317.) Defendant has not shown that defense counsel's decision to proceed with an "ambivalent" alibi defense resulted in representation below an objective standard of reasonableness.

Further, defendant has not met the second prong of *Strickland* which requires that but for counsel's unprofessional errors, the outcome of his trial would have been different. The record indicates that the trial judge considered the evidence defense counsel claims to either have not been provided or to have been overlooked, and determined that it was not of such a character that it would have changed the outcome of the trial. In any event, the incompetence of an attorney does not necessarily entitle a defendant to a new trial, because a defendant is entitled to a fair trial, not a perfect trial. (*People v. Kluppelberg* (1993), 257 Ill. App. 3d 516, 527.) Under the circumstances presented here, a new trial is not warranted.

■ Defendant's further argument that the State violated discovery obligations by failing to provide a certain firearms report is unavailing. Defense counsel admitted in his post-trial motion and at argument on the motion that although the evidence was available to him, he overlooked it.

For the reasons stated above, we therefore affirm the judgment of the trial court.

Affirmed.

BUCKLEY and MANNING, JJ., concur.