THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BARBARA J. REEVES, Defendant-Appellant.

Fifth District   No. 76-88

Opinion filed April 4, 1977.

Michael J. Rosborough and Daniel M. Kirwan, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Loren P. Lewis, State's Attorney, of Benton (Bruce D. Irish and Keith P. Vanden Dooren, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant, Barbara J. Reeves, was indicted for the murder of her husband, Charles Reeves. In a bench trial conducted in the circuit court of Franklin County, defendant was convicted and sentenced to a term of 14 years to 14 years and a day in the penitentiary. In this appeal, defendant contends that she was not proved guilty of murder beyond a reasonable doubt because the evidence shows that the killing was in self-defense and justifiable. We agree.

Around 11 p.m. on August 20, 1974, defendant's sister, Patricia Reeves, and the defendant went to a tavern in Benton, Illinois known as Jolly Jack's. Charles Reeves, the deceased, came into the bar between 11:30 p.m. and 12 midnight. He argued with Barbara for several minutes and then left. No one could overhear what they were saying. After Charles left, the defendant, who was visibly upset, stated in a loud voice several times that she was going to kill that son-of-a-bitch Charlie Reeves. The bar owner testified that she also said something to the effect that you will remember me in the morning I am the one that shot Charlie Reeves; this particular recollection was not corroborated by any other witness present in the bar that evening. The owner further testified that defendant was upset and crying during the whole time she was in the bar. Patricia called defendant's sister-in-law, Deborah Reeves, and asked her to pick them up. Deborah, accompanied by her friend, Michael Standley, drove her pickup truck from her home in Sesser, Illinois, to Jolly Jack's.

After Barbara and Patricia joined Deborah and Michael, the group proceeded, at defendant's request, to defendant's rural home near Whittington, Illinois. They arrived there at approximately 1 a.m., now August 21. Defendant entered the house while the others remained outside. Crashing noises came from the house for a period of five to 10 minutes. When Deborah and Michael subsequently entered the house they found the kitchen area in total disarray.

Defendant brought a shotgun from the house which she wanted to take with her to town. She may also have had a .22 caliber pistol in her hand. Deborah, after lengthy discussion, convinced defendant that taking the ammunition would be a better idea. Michael Standley was handed the shotgun by defendant or one of the other women and he unloaded it. He

was forced to discharge the shotgun once since there was a shell jammed in the chamber. The shotgun was returned to its customary place in the house and a box of shells for it and a box containing as many shells for the .22 caliber pistol as could be found scattered in the house were concealed under the seat of Deborah's truck.

Deborah testified that the defendant wanted to take the guns or ammunition so the deceased could not use them on defendant. He had taken the guns in the past and had threatened defendant with them. Deborah had hidden the guns before during family crises when Charles was in a rage. Charles Reeves had also beaten defendant many times in the past, and on several occasions the beatings were so severe that hospitalization had been required.

Deborah further testified that at this time defendant was scared to death and hysterical. Defendant told Deborah that she just couldn't stand anymore beatings, and Deborah tried to calm her. Michael Standley testified that, at sometime prior to his unloading the shotgun, while it was in the possession of the defendant, he heard her say she was going to wait there until he came home and kill him. No one else remembered her making this statement. Sometime later, after all of this transpired, it was decided that they would go to the Kewpee Cafe in Benton, Illinois, to eat breakfast. The .22 revolver was last seen lying either on the kitchen table or the freezer in the Whittington house.

Defendant, Patricia, Deborah and Michael arrived at the Kewpee Cafe around 3 a.m. They all ordered breakfast, including the defendant. She did not eat all of her breakfast and appeared depressed. They started to leave the cafe around 3:40 a.m. Michael went to the register to pay for the food. The three women started exiting. Patricia went first; Deborah and defendant followed her, respectively, into the entranceway. Charles Reeves came up quickly and pushed by Patricia and swung on Deborah. She managed to avoid his blow. Charles grabbed defendant around the neck and head with his left arm, in a chokehold or headlock, and drug her bodily out of the cafe and down the sidewalk in a southerly direction. He was hitting her continuously about the top of her head with his free hand as he drug her toward his car. Defendant was screaming for help but none was forthcoming.

Defendant testified that she was afraid since she knew what he was going to do and that as he drug her along he said, "Wait until I get you out in the country." She was being choked by his hold on her in addition to being struck upon the head. The distance which the deceased drug defendant was variously estimated by witnesses as being as short a distance as 20 feet to as long a distance as 75 feet. A shot was fired during the struggle as they neared the deceased's car and Charles Reeves collapsed onto the street. When patrons from the cafe reached the scene, defendant was crying and holding the .22-caliber gun seen earlier at the

Whittington house. She was hysterical. The police arrived almost immediately.

The record shows that when the police asked for the gun the defendant took the gun from the waistband of her slacks and handed it to Officer Kellam of the Benton police. Many different exclamations were ascribed to the defendant during the period after the shot was fired but prior to the arrival of the police. Defense witness, Deborah Reeves, testified defendant said, "Oh, tell me he is not dead, I didn't mean to do it." State's witness, Michael Standley, testified she said, "Tell me he is not dead, tell me he is all right." State's witness John Miller testified as follows: "Barbara said, 'I didn't think I would do it,' she said, 'I have killed him.' First she said, 'you didn't think I would do it, did you?' or something of that nature." State's witness, Dennis Odle, testified she said, "Oh, my God, what have I done, did I really do it?" Charles Reeves died shortly thereafter as a result of a wound caused by a single .22-caliber bullet which had entered his body under his left arm and had punctured his left lung and pierced his heart.

Defendant, Barbara Reeves, raised the affirmative defense of self-defense or use of force in defense of person to justify the killing of Charles Reeves. The trial court, sitting as trier of fact, concluded that the evidence did not establish the justification of self-defense and found her guilty of murder.

■■ Although whether a killing is justified under the law of self-defense is always a question of fact to be determined by the trier of fact, and its determination will not be lightly set aside (*People v. Jordan*, 18 Ill. 2d 489, 165 N.E.2d 296; *People v. Vaughn*, 26 Ill. App. 3d 247, 324 N.E.2d 697), the reviewing court, in criminal cases, has a duty to carefully review the evidence and reverse the conviction if the evidence is so unsatisfactory as to raise a serious doubt of defendant's guilt (*People v. Dawson*, 22 Ill. 2d 260, 264, 174 N.E.2d 817). (See also *People v. Fleming*, 36 Ill. App. 3d 612, 618, 345 N.E.2d 10.) After reviewing the evidence in this case, we are compelled to disagree with the trial court's findings and to reverse the conviction because the evidence leaves us with a serious doubt of defendant's guilt.

■■ The defense of self-defense is set forth in section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 7—1), which reads as follows:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. *However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or*

*another, or the commission of a forcible felony."* (Emphasis added.)

The defense was thoroughly discussed in *People v. Williams*, 56 Ill. App. 2d 159, 165-66, 205 N.E.2d 749, 752-54, wherein the elements of the defense were stated as follows:

"These elements are: (1) that force is threatened against the person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable. There is a further principle involved, when, as in the instant case, the defendant uses a deadly force. This principle limits the use of deadly force to those situations in which (a) the threatened force will cause death or great bodily harm or (b) the force threatened is a forcible felony."

Elements (1) through (4), above, were not disputed at trial. The State attempted, by its presentation of evidence, to prove that defendant could not have actually and reasonably believed that the deceased's threatened force would cause her great bodily harm and that deadly force was therefore necessary to avert such harm.

■■ We note, at the outset of our examination, that once the defendant in a murder prosecution properly raises the issue of self-defense by presenting some evidence thereon, the State must prove beyond a reasonable doubt that defendant did not act in self-defense. (*People v. Diaz*, 38 Ill. App. 3d 447, 348 N.E.2d 199; Ill. Rev. Stat. 1973, ch. 38, pars. 7—1 and 3—2(b).) When the defendant claims he acted in self-defense, it is sufficient to acquit him if his evidence on self-defense, together with all the other evidence in the case, creates a reasonable doubt of his guilt. *People v. Williams; People v. Dillard*, 5 Ill. App. 3d 896, 284 N.E.2d 490.

The State emphasized at trial: (1) that no witness saw any bruises on defendant's face; (2) that no weapon was either seen in the deceased's hand when he drug defendant out of the cafe or anywhere near his body after he was shot; and (3) that defendant made statements prior to the shooting and immediately after it which establish an intent to murder rather than to defend herself. We will first examine the sufficiency of the State's evidence on this issue.

The lack of noticeable bruises is not very probative of the issue of self-defense. Defendant's explanation that most bruises inflicted could only have been seen if her hair were shaved off is quite logical and fully supported by the testimony of occurrence witnesses. They all agreed that the deceased had defendant in a headlock when he was striking her. The top of defendant's head would be the area exposed and blows struck at

the head area while she was thus pinioned would necessarily have been to the scalp area and hence concealed by the hair. The threatened force also cannot be judged solely on what injury had already been inflicted on defendant since the defendant testified that deceased threatened continued abuse once he was successful in getting her into the car and out of town.

It is also a matter of slight value on the self-defense issue that Charles Reeves cannot be positively connected with any weapon. It is a firmly established rule that the aggressor need not have a weapon to justify one's use of deadly force in self-defense (*People v. Kelly*, 24 Ill. App. 3d 1018, 322 N.E.2d 527; *People v. Smith*, 404 Ill. 350, 88 N.E.2d 834), and that a physical beating may qualify as such conduct that could cause great bodily harm. *People v. Dowdy*, 21 Ill. App. 3d 821, 316 N.E.2d 33; *People v. Baker*, 31 Ill. App. 3d 51, 334 N.E.2d 249.

The statements made by defendant at the tavern and at the Whittington home may show an intent to kill the deceased. However, it appears defendant abandoned this intent. She decided to go to Benton with her companions rather than remaining at the Whittington abode where Charles would surely come and where there would be no witnesses to any act. Her statements are also consistent with an intent to defend herself with deadly force, if necessary, if he attacked her in a vicious manner as he had in the past. No one overheard what Charles said to defendant at Jolly Jack's, but she was hysterical and scared to death from that time on and endeavored to render harmless the weapons at the Whittington house. The tenor of the majority of statements which were alleged to have been made by defendant after the shooting do not refute her assertion of self-defense. Her attendant hysteria contradicts the belief that this was a premeditated murder.

In the case at hand, we do not believe the State has met its burden of proving beyond a reasonable doubt that defendant's use of deadly force was not justified. The record shows that the deceased, much earlier in the evening, argued with defendant in an unfriendly voice at a bar, although no one ever knew exactly what was said, and that after this encounter the defendant was hysterical and scared to death of the deceased throughout the hours preceding the fatal incident. She had been threatened by the deceased with guns on other occasions and had at times given the guns, customarily kept at the Reeves home, to her sister-in-law for safekeeping until the deceased was no longer in a rage. Defendant had been beaten by the deceased on numerous occasions, often so severely that she had required hospitalization. On the night in question, she wanted to take the guns from her home to keep them from the deceased but eventually agreed to take their ammunition instead. Defendant went to a cafe where she had no reason to believe she would meet the deceased. While leaving that cafe she was grabbed in a chokehold by the deceased and drug some

distance towards his car. He was hitting her continuously on the top of the head as well as choking her with his hold. She screamed for help, but no one came to her assistance. According to the defendant, deceased said to her, "Just wait until I get you out to the country." He almost had her in the car, when a shot was heard and deceased collapsed onto the street. The defendant had a gun in her hand and was hysterical.

■■ We believe the evidence clearly shows that the defendant, who was well aware of the deceased's ability to inflict great bodily harm from past experience, was reasonable in her belief that a danger of great bodily harm to herself was threatened by the deceased and that deadly force was necessary to avert it. Her use of deadly force was justified. Consequently, we find that the evidence is so unsatisfactory and unreasonable that it raises a serious doubt of defendant's guilt. (*People v. Dawson.*) Defendant's conviction for murder is therefore reversed..

Reversed.

G. J. MORAN and EBERSPACHER, JJ., concur.