THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MATTIE CHRISTINE GOODMAN, Defendant-Appellant.

Fourth District   No. 15335

Opinion filed October 16, 1979.

MILLS, J., dissenting.

Paul R. Welch, of Costigan & Wollrab, of Bloomington, for appellant.

Ronald C. Dozier, State's Attorney, of Bloomington (Marc D. Towler and Karen L. Boyaris, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE REARDON delivered the opinion of the court:

On March 13, 1978, the defendant, Mattie Christine Goodman, was indicted with two counts of murder for the death of her husband, Gene Goodman, in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1). Following jury trial, defendant was found guilty of voluntary manslaughter and was subsequently sentenced to 7 years' imprisonment.

At trial, defendant testified that on the evening of February 16, 1978, she arrived home after work at approximately 5 p.m. At home were the couple's son and youngest daughter, David and Nancy Goodman. Shortly before 7 p.m., her husband, the decedent, a Bloomington police sergeant, arrived home on break from his 3 to 11 p.m. shift to eat supper. While in the kitchen, the defendant asked the decedent if they might try to reconcile their marital problems, but decedent said that he wanted to proceed with the dissolution which had been initiated for a second time. They agreed to split the marital property equally and defendant said she and the children would move out of the house. After the decedent returned to work, defendant asked David and Nancy if they knew where the key to the decedent's foot locker was kept. David returned with the key and opened the foot locker, which was located in the bedroom. The defendant and David and Nancy looked through the contents of the foot locker, finding two cards bearing the name of "Carroll." Although unaware of Carroll's identity, defendant believed this to be the decedent's current girlfriend. Defendant then called her attorney, telling him that she had evidence which would support the filing of adultery charges in the pending dissolution proceeding. Both David and Nancy subsequently retired to bed. Defendant went to bed in the couple's bedroom around 11:30 p.m.

Around 4:30 a.m., the defendant heard the decedent come home. The decedent came into the bedroom, took off his gun belt, and laid it on the top of the chest of drawers. As was her custom, defendant left the marital bedroom in accordance with her husband's wishes that she leave when he arrived home from work. According to the defendant, the decedent called obscenities at her as she left the room. She proceeded then into the adjacent bedroom where Nancy slept, turned off the alarm clock, and observed that it was 4:40 a.m. She next went into the living room, where she rested until it was a few minutes after 5 a.m., her usual

time for rising. Defendant walked back into the couple's bedroom to get her back brace and to get ready for work.

Defendant testified that when she entered the bedroom, the decedent was awake and standing by the chest of drawers in his undershorts. On the chest of drawers were his weapon, holster, and ammunition pouch. The room was dimly lit by a small light in the bathroom down the hall. Decedent began to call obscenities at the defendant. A quarrel ensued as she told him he had no right to call her names, since she knew about Carroll. Defendant testified that the decedent started slapping and hitting her, telling her she would never be able to use Carroll against him. Both of them grabbed for the weapon lying between them on the chest of drawers. Decedent obtained control of the weapon by the barrel and began swinging it at the defendant as she started to back away. The defendant stated that she used her arms to fend off the swinging weapon, but was struck by glancing blows to her forehead. Defendant started grabbing for the weapon as the decedent continued to move towards her. She retreated as he advanced past the door into a corner. The decedent suddenly stumbled, and defendant was able to get a grip on the handle of the weapon. She stated that she was afraid that the decedent was going to kill her so she wouldn't tell anyone about Carroll. According to the defendant, the weapon discharged repeatedly. Defendant backed out of the bedroom, still holding the weapon, and saw Nancy in the hallway. Nancy took the weapon out of the defendant's hand and placed it on the kitchen table.

David testified that he was awakened by noises above his room which was in the basement. First, he heard a thud and then he heard a series of three or four shots right after each other. When he went upstairs to find out what happened, he saw his mother and his sister crying. One of the two was holding the weapon, but he was not certain which one. The defendant told him that they were fighting and that the decedent started hitting her in the head with the weapon, and that she somehow grabbed the weapon and the shots went off. David testified that he did not notice anything unusual about his mother in terms of physical injuries except that her forehead was swollen and her eye was "all pushed up."

Nancy testified that after she went to bed that evening she next remembered hearing a door slamming around 4 a.m. She then heard her mother and father arguing. Nancy stated they argued about Carroll, and the decedent said that defendant wouldn't be able to use Carroll against him. Nancy testified that the defendant left the room, went to the living room, and after half an hour, came back into Nancy's room to shut off her alarm. Defendant then went to the couple's bedroom. Nancy heard her parents arguing again. She then heard a snap, like the decedent's weapon

holster was being unsnapped, and a dull thud. She then heard some screams and footsteps like people moving across the floor and then heard some slaps. She heard the valet scooting across the floor, and heard scuffling as if people were wrestling. Finally, Nancy testified that she heard gunshots in rapid succession. She got out of bed and found the defendant with the weapon in her left hand. Nancy put the weapon in the kitchen. According to Nancy, the defendant stated, "Why wouldn't he leave me alone?"

Decedent had no respiration or evident heartbeat upon arrival at St. Joseph's Hospital and was pronounced dead at 5:50 a.m. Dr. Albert Schweitzer, a pathologist at St. Joseph's Hospital, performed an autopsy on the decedent. He testified that he found a missile hole in the left frontal area of the hairline approximately 1½ centimeters to the left of the midline and considerable powder marks. Dr. Schweitzer also found three other wounds, lacerations on the left hand, and a missile hole in the chest and left thigh. According to Dr. Schweitzer, the wound to the thigh, chest, and hand were not fatal, but the wound to the brain was fatal.

Charles Crowe, a Bloomington Police Department detective, interrogated the defendant at the police station after the incident. Crowe testified that he noticed that the defendant at that time had several small bumps on her forehead and a blood blister about the size of a pencil eraser at the center of her forehead. Dr. William Fleming, an emergency room physician at St. Joseph's Hospital, also examined the defendant between 8:47 a.m. and 10:45 a.m. the morning following the incident. According to Dr. Fleming, defendant had three reddish bumps on her forehead, "remarkably equally spaced," which defendant stated were made by the butt of the weapon. Dr. Fleming also observed tender areas under her eyes and on her nose. Defendant also had a bruise on her left forearm near her elbow and powder burns on her left hand. Dr. Fleming characterized the injuries as minor contusions, but ordered X rays of defendant's spine, neck, and facial bones. The X rays were read negative or normal.

During the investigation following the incident, Robert McGowen, a Bloomington police officer, testified that decedent's holster and belt were lying on the dresser on the west side of the room. While taking measurements of the room, officers discovered a wallet, six live rounds, and a set of keys between the mattress and the box springs of the marital bed.

Robert C. Craig, a step-nephew of the decedent by marriage, testified over defendant's objection that he had two conversations with the decedent in the last week of January and one on the night of February 9. Craig stated that on February 9, decedent expressed a fear that something might happen at home, and because of that fear he was

continuing a practice of unloading his service revolver and placing it and the ammunition in a different place. Craig also stated that on one other occasion they had a conversation in which decedent said that one of his daughters told him that his other daughter had tried to poison him.

Carroll Baughan testified that decedent was at her house the night before he was shot. Decedent came to visit her about 11:30 or 11:45 p.m. and left around 3:30 or 3:40 a.m. Over defendant's objection Baughan stated that during the time she knew the decedent, she had three different conversations with him in which he stated that he was in fear of his life. Each time he mentioned that he was afraid his wife would kill him while he was asleep. Baughan also stated that decedent had told her that he had a habit of putting his bullets under the mattress.

William Rusk, a police officer and friend of the decedent, testified over defendant's objection to conversations with the decedent on February 15 and 16, 1978. During these conversations decedent mentioned that he was in the habit of unloading his service revolver and hiding the bullets because he was in fear for his life. Decedent told Rusk that he wanted to get his divorce over quickly because of that fear.

Clay Taylor testified that he had known decedent for approximately 4 years. Taylor stated that early in September of 1977, decedent had a conversation with him in which decedent expressed a fear for his life. According to Taylor, decedent told him that each morning he would come home and place his bullets underneath the mattress.

Prior to trial, the defendant filed a motion *in limine* to preclude the prosecution from introducing or asking any questions relating to conversations by others with the decedent concerning his fear for his own safety and life. The trial court denied defendant's motion.

On appeal, defendant contends that she was not proved guilty beyond a reasonable doubt of voluntary manslaughter because the State failed to establish that she was not acting in self-defense when she shot her husband. Section 7—1 of the Criminal Code of 1961 provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1977, ch. 38, par. 7—1.

■■ ■ When a defendant properly raises the issue of self-defense by presenting some evidence thereon, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. (*People v.*

*Diaz* (1976), 38 Ill. App. 3d 447, 455, 348 N.E.2d 199, 206; *People v. Pearson* (1972), 4 Ill. App. 3d 462, 465, 281 N.E.2d 422, 424; Ill. Rev. Stat. 1977, ch. 38, par. 3—2(b).) Where a defendant claims he acted in self-defense, it is sufficient to acquit him if his evidence on self-defense, together with all the other evidence in the case, creates a reasonable doubt of his guilt. (*People v. Reeves* (1977), 47 Ill. App. 3d 406, 410, 362 N.E.2d 9, 13.) The standard we must apply was further stated by the court in *Reeves*:

> "Although whether a killing is justified under the law of self-defense is always a question of fact to be determined by the trier of fact, and its determination will not be lightly set aside [citations], the reviewing court, in criminal cases, has a duty to carefully review the evidence and reverse the conviction if the evidence is so unsatisfactory as to raise a serious doubt of defendant's guilt [citations]." 47 Ill. App. 3d 406, 409, 362 N.E.2d 9, 12.

The defendant maintains that the evidence in the record supports a *prima facie* case of justified force. The State concedes in its brief that defendant's story would probably justify a claim of self-defense if true. The State, however, argues that defendant's account of how the shooting occurred was contradicted by other evidence introduced by the State, and the defendant's evidence was so implausible as a whole as to allow the jury to totally discount it.

■■ The State essentially relies on the testimony of four witnesses that the decedent was afraid for his life and as a result, hid his ammunition when he returned home from work. Since six shells, a wallet, and keys were found under the mattress of decedent's bed, the State contends that the evidence clearly establishes that the defendant loaded the gun. While the testimony of these witnesses concerning conversations with the decedent before his death constitutes hearsay, such testimony may be regarded as admissible under the state of mind exception to the hearsay rule. (*People v. Reddock* (1973), 13 Ill. App. 3d 296, 300 N.E.2d 31.) In *People v. Long* (1977), 55 Ill. App. 3d 764, 370 N.E.2d 1315, this court noted that although *Reddock* did recognize the state of mind exception, its application is limited to instances where (1) the declarant is unavailable, and (2) there is a reasonable probability that the proffered hearsay statements are truthful. We find that both requirements have been met in the present case and particularly note that decedent's statements to the third parties about his fears for his life were offered only to show that decedent had the habit of unloading his weapon and hiding his ammunition and not to establish that defendant shot him.

■ However, despite the limited admissibility of this unrebutted testimony concerning the decedent's practice of unloading his revolver

and hiding his ammunition, we are not convinced that the State has met its burden in overcoming defendant's claim of self-defense. It is true, as the State points out, that other inconsistencies in the defendant's story exist. Yet, the record reflects that the State was unable to refute evidence by the defendant that a struggle took place between the decedent and the defendant for the weapon immediately prior to its discharge. Powder burns found on decedent's body at the bullet entry sites are consistent with defendant's claim of a struggle and the weapon discharging at close range. The medical examination of the defendant the morning following the incident revealed that defendant had bumps on her forehead, tender areas on her face, a bruise on her arm, and powder burns on her hand. Both David and Nancy Goodman's testimony at trial was consistent with defendant's version of events immediately preceding the shooting. Furthermore, defendant need only to have subjectively believed she was in danger of losing her life or suffering great bodily harm to be justified in using deadly force. (*People v. Kelly* (1975), 24 Ill. App. 3d 1018, 1027, 322 N.E.2d 527, 534.) While it is not clear whether the decedent would have actually caused great bodily harm or death to the defendant, it is not unreasonable for the defendant to have subjectively believed that she would suffer great bodily harm where the advancing decedent was striking her with the butt of a weapon.

We note that in the analogous case of *Reeves*, the Fifth District reversed a defendant's murder conviction where the claim of self-defense lacked the degree of corroboration present in the instant case. There, during an argument between the defendant and her husband in a bar, the defendant stated in a loud voice that she was going to kill her husband. The defendant even told the bar owner to remember her in the morning as the one responsible for her husband's death. As the defendant was leaving a cafe with friends later that evening, the defendant's husband forced her bodily out of the cafe and dragged her toward his car while he beat her on the head. As they struggled near the car, a shot was fired and defendant's husband collapsed. It was established that the shot came from a .22-caliber weapon seen earlier in the defendant's possession. Despite the prior statements by the defendant that she intended to kill her husband, the testimony that no bruises were observed on defendant's face, and the fact that the deceased was not seen in possession of a weapon, the court held that the State failed to sustain its burden of disproving beyond a reasonable doubt that defendant did not act in self-defense.

After careful review of the record, we conclude and hold that the evidence failed to prove beyond a reasonable doubt that the defendant did not act in self-defense. Accordingly, the judgment of the circuit court

is reversed. Because of our disposition, we do not reach the other issues raised by the defendant.

Reversed.

TRAPP, J., concurs.

Mr. JUSTICE MILLS, dissenting:

The majority is merely second-guessing the jury.

I do not view the contextual quality of the evidence as do my brothers.

To my view, this case poses the classic jury question: Determining the credibility of the witnesses, the weighing of the evidence, and deciding whether or not reasonable doubt as to the guilt of the defendant exists. The jury found here that there was no such doubt as to voluntary manslaughter and returned a verdict of guilty.

It is not our province to meddle and mess with that finding, to substitute our personal view for that of the trier of fact or to engage in second-guessing. We each have our respective role to play in the judicial process—counsel, trial judge, jury, and reviewing court. And when we forget our proper parts, or try to assume or play another's character, the function of the whole is imbalanced and the system flounders. Our method of justice is finely tuned and precisely tooled. Its smooth operation depends upon each part functioning within its designated orbit and relying on the other mechanisms doing theirs—without interference. Once one part takes away from another, or exceeds its allotted authority, the entire machine becomes out of sync, faulty and incapable of high performance.

The checks and balances are there, of course, but they are to be used sparingly—and only when another partner in the process so patently fails to function properly is a reviewing court justified in preempting the field.

The record tells us that some 17 witnesses testified. There was a rancorous and biting marriage. There was a real or imagined paramour. There were bullets under pillows. There was a wrangle and scuffle. Five .357 magnum bullets were expended. Decedent was hit three times with armor-piercing bullets (not the type normally carried in the service weapon used by him on police duty). It was all complex, all piecemeal, some contradictory.

The jury heard it—it was the jury's call.

We have no business second-guessing the trier of fact and that is precisely what I think the majority is doing here.

I would affirm the jury's verdict.