2023 IL App (1st) 220107-U
No. 1-22-0107
Order filed December 22, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 0367 01 |
| | ) | |
| BRIAN HEWLETT | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices C.A. Walker and Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held:* Reversed and remanded, where trial counsel provided ineffective assistance by abandoning a self-defense claim and the trial court manifestly erred by denying this claim of ineffective assistance after a post-trial evidentiary hearing.

¶ 2    An accused secures the right to present a defense through counsel. Ordinarily, courts presume counsel acts strategically. But this presumption does not preclude assessing counsel's choices, particularly when counsel takes the stand to testify about what they did and why.

¶ 3    Counsel advised Brian Hewlett to abandon a self-defense claim and instead attack the sufficiency of the State's case. But counsel never disputed that, minutes after the shooting, police

arrested Hewlett, gunshot residue on his hands, sitting feet from the only recovered firearm, which police connected to the recovered shell casings.

¶ 4     Given what counsel knew and analysis of the facts, we find that convincing Hewlett to abandon self-defense constitutes a clearly evident, plain, and indisputable error. We reverse the denial of Hewlett's post-trial motion and remand for a new trial.

¶ 5                               Background

¶ 6     Brian Hewlett and his brother Michael McNabb stood accused of (i) the first-degree murder of Tyrone Lawson and (ii) the aggravated discharge of a firearm and attempted first-degree murder of Denzell Collins. Before the joint bench trial began, the trial court severed the cases on its own initiative and tried them simultaneously. At the close of the State's cases, the trial court directed a verdict in McNabb's favor, finding accountability unproven. At the close of the defense, the trial court found Hewlett guilty. Hewlett retained new counsel, and after an evidentiary hearing, the trial court denied Hewlett's post-trial claim of ineffective assistance of counsel.

¶ 7                              Bench Trial

¶ 8     The State accused Hewlett of chasing and shooting at a group outside of a high school basketball game, killing Tyrone Lawson. The core of the State's case included: (i) out-of-court statements identifying the shooter as Hewlett, (ii) security footage of Hewlett and others soon after the shooting, (iii) officer testimony on the events leading to Hewlett's on-site arrest, and (iv) firearm and ballistics evidence.

¶ 9     The State introduced as substantive evidence the out-of-court statements of Denzell Collins after he testified he could not recall most details about either the shooting or his later interviews. Collins had testified that he and his friends saw Lawson outside the arena, no one had weapons,

and Lawson died that night. At trial, he recalled little else. He did not remember providing a written statement the day after the shooting, identifying Hewlett in a lineup, providing another statement the next day, or testifying before the grand jury the next month.

¶ 10    The State called an investigator, a detective, and two assistant state's attorneys to testify about interviewing Collins, overseeing the lineup, and calling him before the grand jury. The State introduced as exhibits Collins's narrative statements and lineup forms. (A signature of "Denzell Collins" appears on all documents except the grand jury transcript.)

¶ 11    In these statements, Collins did not identify Hewlett at first. Collins said he was outside the arena mingling when he heard shots, ran, and returned to see Lawson on the ground. Collins's second statement, the same day after identifying Hewlett and McNabb in a lineup, stated he knew them "from the streets" and it would have been "pointless to fight," considering that the police were "everywhere." Yet, when Collins saw Hewlett and McNabb again, Hewlett "pulled out a gun," chased Collins' "whole crowd," and started shooting. Collins' third statement asserted he and his friends stayed away from McNabb, whom they knew as "Mike-Mike" and as "dangerous,' because "they did not want any trouble." In this statement and his grand jury testimony, Collins recounted more detail about the shooting and his decision-making, adding that a discussion with Lawson's mother persuaded him to tell the "whole truth" and identify McNabb and Hewlett.

¶ 12    The State also introduced as substantive evidence an out-of-court statement from Dylon Collins, Denzell's brother, after he, too, failed to recall details about the shooting and giving the statement. (The State introduced the narrative statement, signed by Dylon Collins as an exhibit, and called an investigator to testify about interviewing him.) Dylon Collins' statement did not identify Hewlett or McNabb, asserting that he had heard about four gunshots from behind as he

and his friends walked to the parking lot, then "heard a couple more rounds" and soon saw Lawson on the ground, bleeding.

¶ 13    Sergeant Wilbert Norey recounted that before the shooting, McNabb and a young girl banged on an arena door, seeking entry. "[T]he young lady was very distraught" and said someone "had brandished a firearm at her and her father." She did not give the name of the person with the firearm or identify him in any way. Norey let McNabb's daughter enter; McNabb remained outside, saying that he was "going to take care of something," and headed toward the area where the shooting occurred. (Later, the trial court found Norey's testimony about what McNabb had said was both false and irrelevant to Hewlett.)

¶ 14    Surveillance video did not capture the shooting. Norey narrated parts of the video, showing people running across a parking lot near where officers would find Lawson, including someone in a hoodie. On cross-examination, Norey concluded that two flashes of light near this person were reflections from headlights and an interior car light, not gunshots. Elsewhere in the video, Norey described a jeep slowing down to open its door before leaving the parking lot.

¶ 15    Officers arrested Hewlett and McNabb in a jeep waiting to leave the parking lot. Based on information from a radio call, Officer James Bansley pulled the jeep over and arrested the driver, McNabb, and the backseat passenger, Hewlett. As Bansley arrested them, Officer Mero arrived and approached the passenger side. The driver behind the jeep told Mero to "look at the ground." Near the jeep's rear tire, Mero saw a Glock 9 semi-automatic handgun, which he retrieved.

¶ 16    Officers took Hewlett and McNabb to a station for booking. Officer David Ryan testified that he photographed Hewett and tested his hands for gunshot residue. While doing so, Hewlett admitted to Ryan he had not washed his hands since the arrest and was left-handed.

¶ 17    Analysts tested gunshot residue, the firearm, bullets, and cartridges. An officer had testified to searching "more than 100 feet" outside the crime scene tape and finding three fired cartridges about 20 feet from one another. An analyst testified the recovered firearm had fired the three recovered cartridges, and the unfired cartridges corresponded to the style of the two bullets recovered from Lawson. Neither Lawson nor McNabb had any gunshot residue on his hands. (An analyst testified that activity may remove gunshot residue.) But Hewlett's hands had gunshot residue. An analyst testified that a person standing three to six feet from a fired weapon could test positive for gunshot residue. The particles on Hewlett's hands, present in a greater volume on his left hand, matched the particles on the fired cartridges.

¶ 18    The State rested its case. The trial court denied Hewlett's motion for a directed verdict.

¶ 19    Defense counsel called one witness and submitted two stipulations. Counsel "reserve[d]" the option to give an opening statement before the State's case but dispensed with it to open the defense. (Before trial, counsel described as "our theories," referring to him and McNabb's counsel, as "neither of these men was the shooter.")

¶ 20    Tremaine Horton testified that he was about 15 feet from the shooting and knew Hewlett, Lawson, and their families. Before the shooting, there was a fight, so he and others waited inside the arena after the game. Some time passed before they walked to the parking lot. On the way, a group of five young men quickly walked past them and exchanged words with "another set of people." Horton got inside his car and soon heard the two groups exchange gunfire "back and forth." Lawson was a member of the group that fired the initial shot, though he did not shoot.

¶ 21    Horton saw Lawson fall to the ground but never saw Hewlett. About 14 shots came from "four different areas." The police briefly detained Horton when he tried to leave the parking lot

but did not question him about the incident. Horton gave a statement for "People v. Michael McNabb Jr." about a week after the shooting. In this written statement, Horton did not describe either Hewlett or Lawson, though he described being 30 feet away from the two groups of "Black males" who had a "gunfight."

¶ 22    The parties stipulated that, if called to testify, an investigator would recall Collins telling her on the night of the shooting he heard 12 shots, and that Collins was "wearing the same clothing he had on during the incident, "black hoodie, blue jeans, tan shoes." (Counsel had cross-examined Collins, who did not recall speaking with investigators.) The parties also stipulated that DNA analysis of the recovered firearm contained one major profile excluding Hewlett, and two minor profiles unsuitable for comparison.

¶ 23    The trial court did not admonish Hewlett on his right to testify, and Hewlett did not testify.

¶ 24    In closing, the State described its evidence as "incontrovertible," focusing in rebuttal on the physical evidence and arrest. "The fact of the matter is even without the evidence of Denzell Collins; you have Brian Hewlett leaving the scene of a murder with positive [gunshot residue] on his hands and the murder weapon." Hewlett's counsel, who did not acknowledge the gunshot residue, contended that, unlike Collins, Horton was credible, the State had no DNA or fingerprint evidence connecting Hewlett to the firearm, and the State's "flawed investigation" did not amount to proof beyond a reasonable doubt.

¶ 25    The trial court found Hewlett guilty on all counts.

¶ 26                                  Motion for a New Trial

¶ 27    Counsel moved for a new trial and withdrew from the case. New counsel amended the motion, alleging trial counsel provided ineffective assistance by (i) failing to investigate the

accuracy of the surveillance video, (ii) ignoring the weight of the gunshot residue evidence, and (iii) abandoning self-defense, in part, by failing to call witnesses. The trial court heard the testimony of an expert on digital forensics and testimony from Hewlett, McNabb, McNabb's daughter, Micaela, and trial counsel.

¶ 28                                      Hewlett

¶ 29    Hewlett testified he caught a ride to the arena to meet McNabb, who went there to pick up Micaela. When Hewlett arrived, he thought Micaela "looked distraught, like she had been crying." McNabb and Micaela were near the arena. As they walked to the parking lot, about 10 "guys" appeared. One spoke to McNabb, who responded, "I don't want no trouble." A second said, "I don't care about your daughter," and "I will kidnap her." A third told McNabb, "I can't let you leave here alive." That person swung at McNabb, and someone else punched Hewlett in the jaw.

¶ 30    The entire group rushed toward them. Hewlett testified that one person wearing a black hoodie pulled out a gun and pointed it at him. At that moment, Hewlett believed they would die, so he backed away, drew his firearm, and fired "two, maybe three shots, just to scare them off, maybe just to get them to back away." He then ran and heard "about eight, maybe ten shots." He hid behind a car but soon heard McNabb calling his name from the jeep and jumped in.

¶ 31    Hewlett confirmed he illegally carried the firearm and threw it out the jeep's window when police approached because he "didn't want anything to happen if [the police] did see [the] gun," that is, he "didn't want to be shot, injured or nothing."

¶ 32                                      Micaela

¶ 33    Micaela McNabb testified that, at the time, she was 12 years old and had attended a basketball game with a friend before leaving early to meet her father. As she and her father walked

to the parking lot, about 10 boys approached, making "smart remarks" that caused them to walk back toward the arena. Sometime later, McNabb and Micaela again walked to the car and again encountered the group. One boy pointed a gun at the ground and said, "What's up, Mike Mike." Her father said, "[L]eave me alone. I have my daughter with me." The group laughed, and she and her father ran towards the arena.

¶ 34    A security guard let her inside; her father stayed outside. When the game ended, Micaela left and met up with her father and uncle, Hewlett, on the side of the arena. Micaela told her father she had found another ride. Micaela also saw the same group of boys nearby. She did not see Hewlett holding or shooting a gun.

¶ 35    About a week later, Micaela gave a written statement to an investigator. She also met with counsel regarding what she would say at trial. (Counsel listed Micaela as a defense witness in discovery, and she appeared under a subpoena on the first day of trial.)

¶ 36                               McNabb

¶ 37    Michael McNabb testified that he met his daughter at the arena. As they walked to the parking lot, about 10 young men approached. McNabb exchanged words with Dylon Collins, who had a reputation for violence. After that, McNabb and Micaela walked back toward the arena.

¶ 38    After some time, they again set out for the parking lot, but the same group was there rapping about kidnapping and killing Micaela. McNabb saw one person pull a gun and point it at the ground. He and Micaela ran to the arena; Micaela re-entered, and he stayed outside. More time passed, and Micaela reappeared to tell McNabb she would get a ride home with a friend. Hewlett arrived, but McNabb did not share what happened or ask Hewlett whether he was armed.

¶ 39   McNabb and Hewlett walked toward the parking lot. Soon, Dylon Collins and the group surrounded them. Dylon Collins said, "You know I can't [let] you leave up out of here," which McNabb understood meant Dylon Collins would shoot him. Dylon Collins swung at him, and someone else pointed a gun. Then McNabb heard about 10 gunshots from different directions as "he ducked and ran[.]" He did not see where his brother had gone. When he got back to his car, he saw Lawson on the ground. McNabb got in, saw Hewlett, and called for him to get in. McNabb did not see Hewlett with a gun or drop a gun.

¶ 40   McNabb testified that Hewett's trial counsel never asked him for his version of events and to testify. After his acquittal, McNabb attended the rest of the trial. He said that had he testified at trial, the substance would have been the same as his testimony.

¶ 41                                        Digital Forensics

¶ 42   An expert in digital forensics testified that the surveillance video used at trial was a screen capture, not an exported file, "of less quality" and "highly pixelated." He enhanced and clarified the video, particularly two moments when flashes of light appeared. In his opinion, the first featured two flashes of light near an SUV. One flash came from inside the SUV, and the other from someone standing on the driver's side. The second featured two flashes resembling gunfire, near someone running with an arm pointed backward, but the video's low quality precluded confirming that person held a firearm.

¶ 43                                        Hewlett's Counsel

¶ 44   Counsel testified that he and Hewlett discussed raising (perfect and imperfect) self-defense on "many" occasions before trial. Counsel filed a *Lynch* motion (*People v. Lynch*, 104 Ill. 2d 194 (1984)) before trial, seeking to admit Lawson's social-media posts, including a photograph

showing Lawson and another person with firearms. Counsel withdrew the motion after the court doubted his ability to authenticate the material. Still, without this *Lynch* material, counsel believed self-defense "might be a viable defense" because (i) Hewlett tested positive for gunshot residue, (ii) Micaela described someone pointing a gun at her and her father, and (iii) forensics connected the recovered firearm with the recovered cartridges.

¶ 45    Counsel began doubting this strategy after two developments (i) Collins' testimony at the hearing to suppress indicated that he was unlikely to identify Hewlett as the shooter at trial and (ii) counsel learned that Cory Atwater, who had identified Hewlett before trial, was dead.

¶ 46    Counsel met with Hewlett a month before trial to hear "exactly what he would testify to if he was to take the witness stand in self-defense." Disclaiming a word-for-word recollection, counsel said:

> "[Hewlett] told me all about coming to Chicago State with his brother, he told me about having a gun with him, you know[.] I remember him telling me I believe how he got there, and he asked Mike why [Micaela] was crying, you know, and I think he may have heard -- I think he heard one of the boys had a gun, you know, and then there was -- when he was there, he was confronted, they came up to him, there was a physical confrontation, he was punched. But what I was looking for and what I didn't hear is that before he fired, there was imminent danger of death or great bodily harm. He never said a gun was pointed at him to me because obviously, if the gun was pointed at him, he doesn't even have to wait, you know, to be shot at to be justified in shooting back. So my heart sort of the sank, actually, to tell you the truth, when I went through that with him[.]"

Asked whether Hewlett had a gun pointed at him, counsel stated, "Not before he fired[,]" adding,

"I think he believed they had weapons, and I believe, yes, that's probably true, you know, based on [Micaela] seeing the gun and the way they were acting, the things that they said. One of the things that struck me, and appeared to resonate with him and what he was hearing is that, 'We can't let you leave here,' whatever that means."

Hearing Hewlett's account, counsel thought, "[W]ithout actually seeing a weapon pointed at him or actually -- not actually seeing the weapon at the time wouldn't make it imminent[.]"

¶ 47    Counsel advised Hewlett to forgo self-defense in favor of reasonable doubt, contesting the shooter's identity. He recounted how Hewlett trusted his judgment, agreed to abandon self-defense, and appeared relieved not to testify. (In contrast, Hewlett testified counsel never said they would abandon self-defense.) Now pursuing misidentification, counsel assessed how to present it, specifically whom to call and how to address firearm forensics and gunshot-residue evidence.

¶ 48    Counsel spoke with the State's gunshot-residue analyst before trial and knew: (i) McNabb's hands had tested negative; (ii) Hewlett's hands had tested positive; and (iii) "no witness had identified [McNabb] as carrying a weapon." Counsel cross-examined this expert on "the absolute fact that you don't have to have fired a gun to have gunshot residue on your hands."

¶ 49    As for firearm forensics, counsel testified that he knew the police recovered the gun next to the red jeep in which Hewlett was riding and the shells recovered matched the gun. Counsel planned to argue that "somebody else had thrown that gun that appeared near the red jeep," and the other shooters were responsible for the murder.

¶ 50    As for defense witnesses, counsel explained why he called Tremaine Horton and neither Micaela nor McNabb. Counsel had visited the crime scene with Micaela. In his view, Micaela's account supported a self-defense theory, thereby of no "help in a[n] identification case." As for

McNabb, his background and credibility undermined his account, and his testimony would have not assisted the reasonable doubt theory. Horton's testimony, however, allowed counsel to argue (i) Hewlett was not the shooter and (ii) Lawson was a member of a group of who "had come down this hill into the parking lot and were firing first at another group in the parking lot."

¶ 51                                    Motion Denied

¶ 52    The trial court denied Hewlett's motion, finding, "[E]specially as it applies to testimony given by the defendant * * * [that] would not have changed the outcome."

¶ 53                                      Analysis

¶ 54    This appeal calls us to review an evidentiary hearing on a motion for a new trial. Hewlett contends the trial court erred by denying his claims that trial counsel provided ineffective assistance and certain prior inconsistent statements were improper evidence of guilt.

¶ 55                                 *Strickland* Claim

¶ 56    Hewlett contends counsel provided ineffective assistance by reason of (i) counsel's unreasonable actions under "prevailing professional norms" and (ii) had counsel not so erred, the reasonable probability of acquittal. *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984).

¶ 57    The nature of Hewlett's claim dictates we be doubly deferential. We defer to counsel's on-the-ground choices, guarding against second-guessing tactics. *Strickland*, 466 U.S. at 687-89. And, we defer to the trial court's denial of these claims after hearing them in full unless the claims' merits are "clearly evident, plain, and indisputable." *People v. Jackson*, 2020 IL 124112, ¶ 98.

¶ 58    Hewlett asserts counsel erred in investigating the case through closing arguments, raising many contentions of error. The State focuses on the standard of review, noting inconsistencies between counsel's and Hewlett's recollections of conversations do not create manifest error. See

*People v. Huffman*, 81 Ill. App. 3d 901, 907 (1980) (reviewing court may not substitute its credibility finding for factfinder's). But the State goes further, arguing the trial court's "denial of [Hewlett's] claims could only be based on a rejection of [Hewlett's] testimony and an acceptance of the contrary testimony of [] counsel." While usually the situation, counsel's testimony can, as here, make it "clearly evident, plain, and indisputable" that the defendant received ineffective assistance. *Jackson*, 2020 IL 124112, ¶ 98 (stating standard).

¶ 59    Hewlett argues counsel's abandoning of self-defense was "unsound" for three reasons. First, counsel felt the State had insufficient evidence of guilt. Second, the counsel did not know how to authenticate *Lynch* evidence of Lawson's character. Third, counsel thought self-defense was unavailable "absent a gun being pointed at Hewlett." We agree that counsel's testimony established that he misunderstood the law of self-defense and focus on that contention.

¶ 60                                   Law of Self-Defense

¶ 61    Counsel testified at the evidentiary hearing on meeting with Hewlett before advising him against pursuing self-defense. After listening to Hewlett's account, counsel concluded, "[W]hat I was looking for, and what I didn't hear is that before [Hewlett] fired, there was imminent danger of death or great bodily harm." According to counsel, "without actually seeing a weapon pointed at him or actually -- not actually seeing the weapon at the time wouldn't make it imminent[.]"

¶ 62    Self-defense is an affirmative defense. *People v. Jeffries*, 164 Ill.2d 104, 127 (1995). A person may use deadly force when "he [or she] reasonably believes that such force is necessary to prevent imminent death or great bodily harm to [themself] or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a). The defendant has the burden to show: (i) unlawful force was threatened; (ii) the person threatened was not the aggressor; (iii) the danger of harm was imminent;

(iv) the use of force was necessary; (v) the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (vi) the beliefs of the person threatened were objectively reasonable. *Jeffries*, 164 Ill.2d at 127-28.

¶ 63    Counsel testified that his advice hinged on analyzing the third element, whether the danger of harm was imminent. Counsel recalled Hewlett describing: (i) his niece crying because someone in the group had brandished a firearm at her and her father; (ii) a short time later, the same group confronted Hewlett and McNabb; and (iii) one person in the group punched Hewlett without provocation. Under these facts, the danger of harm was not imminent—it was occurring.

¶ 64    Given what Hewlett knew, the group's size, and the sudden violence the group initiated, counsel erred by concluding the danger of harm to Hewlett was not imminent under the law. As Hewlett points out, "a physical beating may qualify as such conduct that could cause great bodily harm." *People v. Reeves*, 47 Ill. App. 3d 406, 411 (1977). And "the aggressor need not have a weapon to justify one's use of deadly force in self-defense[.]" *Reeves*, 47 Ill. App. 3d at 411. Finally, "the law does not charge a person when he has reasonable grounds to believe himself in apparent danger of losing his life or suffering great bodily injury, to use inerrable judgment." *People v. White*, 87 Ill. App. 3d 321, 323 (1980). Given what Micaela told Hewlett, the law does not demand perception of ultimate harm be prescient. Counsel erred by concluding otherwise.

¶ 65    In reaching this conclusion, we reject as baseless the State's repeated assertion that counsel "develop[ed] two potential defenses simultaneously," sufficiency and self-defense. The trial record demonstrates that counsel argued in closing only the insufficiency of the State's evidence. Indeed, at the post-trial hearing, counsel explained why he abandoned self-defense, rebutting the State's assertion that he pursued an alternative theory of self-defense. Nor did the trial court consider self-

defense on its own initiative. The record shows the trial court barring counsel from using a photo of Lawson (proposed Defense Exhibit 2), which, in the court's view, would have required counsel to have litigated the *Lynch* motion he withdrew before trial.

¶ 66    While "the choice of defense theory is ordinarily a matter of trial strategy" and counsel "has the ultimate authority to decide" strategy (*People v. Guest*, 166 Ill. 2d 381, 394 (1995)), counsel still must observe "prevailing professional norms." *Strickland*, 466 U.S. 687-89. Those norms do not shield a misapprehension of the law. *People v. Wright*, 111 Ill. 2d 18, 30-31 (1986) (finding misapprehension of intoxication defense failed to satisfy objective standard of reasonable competence). After carefully reviewing the record, we find his error to have been clearly evident, plain, and indisputable. See *Jackson*, 2020 IL 124112, ¶ 98 (stating standard).

¶ 67                                          Prejudice

¶ 68    Given counsel's error, we analyze whether a reasonable probability exists for an acquittal absent the error. *Strickland*, 466 U.S. at 687-89. Measuring that probability requires considering all the evidence before the trial court and how the error impacted the trial court's "overall picture of events." *People v. McCarter*, 385 Ill. App. 3d 919, 935-36 (2008).

¶ 69    In rejecting Hewlett's claim, the trial court found that his post-trial testimony "especially" was insufficient to show prejudice under *Strickland*. The trial court's focus was too narrow. *McCarter*, 385 Ill. App. 3d at 935-36. Here, evidence supporting a claim of self-defense does not hinge on Hewlett's credibility. See, *e.g.*, *People v. Jones*, 175 Ill. 2d 126, 133 (1997) (noting, "circumstantial evidence presented by the State [may] raise [] affirmative defense").

¶ 70    As it happens, the State's case-in-chief presented evidence supporting a claim of self-defense. Collins' second statement, admitted as substantive evidence, alluded to a motive for

Collins and the others to attack Hewlett and McNabb. Collins stated that he knew them "from the streets" though it would be "pointless to fight" as the police were "everywhere." Sergeant Norey's testimony described Micaela as tearfully reporting having just seen a firearm while walking with her father. Finally, Hewlett tested positive for gunshot residue in a greater quantity on his dominant hand, and forensics connected the gunshot residue from the firearm recovered near his brother's car with the only cartridges recovered from the scene.

¶ 71    Given the nature of the State's evidence, the prejudice to Hewlett was dramatic. Counsel's failure to articulate a viable defense theory ensured Hewlett's conviction. At trial, the State noticed this and pounced on that weakness in the rebuttal at closing argument. Hewlett's counsel had ignored the evidence about gunshot residue. So, the State argued, "The fact of the matter is even without the evidence of Denzell Collins, you have Brian Hewlett leaving the scene of a murder, with positive [gunshot residue] on his hands and the murder weapon."

¶ 72    The State's case did two things: (i) offered an opening for raising a claim of self-defense and (ii) begged an explanation, one that a claim of self-defense could answer. The trial court overlooked this point and failed to analyze the post-trial testimony of McNabb, Micaela, and the expert on digital forensics. Their testimony supported a finding of prejudice as it reflects the evidence in the State's case-in-chief and justified Hewlett's actions. See *Bazydlo v. Volant*, 164 Ill. 2d 207, 214-15 (1995) (forbidding judges from "arbitrarily or capriciously reject[ing] unimpeached testimony"). Unless contradicted, inherently improbable, or impeached, "testimony cannot be disregarded even by a jury." *People ex rel. Brown v. Baker*, 88 Ill. 2d 81, 85 (1985).

¶ 73    But even had all this evidence led to a finding that Hewlett was not justified in killing Lawson, he still could have argued for second-degree murder, "a lesser-mitigated offense" of first-

degree murder. *People v. Wilmington*, 2013 IL 112938, ¶ 48. Second-degree murder occurs when a person unlawfully kills another person under the "unreasonable" belief that the circumstances "justify or exonerate the killing." 720 ILCS 5/9-2(a)(2).

¶ 74    A second-degree murder verdict would have led to a sentencing range of 4 to 20 years' imprisonment, a maximum sentence nearly half the minimum 45 years imprisonment Hewlett faced. 730 ILCS 5/5-4.5-30(a) (defining sentencing range for second-degree murder); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (defining firearm addon for shooting that proximately causes death); 730 ILCS 5/5-4.5-20 (defining base sentencing range for first-degree murder). The 20-year cap is 34 years less than the sentence than the 54 years he received for first-degree murder. See *Glover v. United States*, 531 U.S. 198, 203 (2001) (noting, "any amount of actual jail time has Sixth Amendment significance").

¶ 75    After reviewing the record, we find prejudice. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45 (noting, prejudice may exist when chance of acquittal "significantly less than 50 percent" if verdict reasonable). And that prejudice was clearly evident, plain, and indisputable. See *Jackson*, 2020 IL 124112, ¶ 98 (stating standard).

¶ 76                              Admission of Prior Inconsistent Statements

¶ 77    Finally, Hewlett contends the trial court erred by admitting as substantive evidence out-of-court statements by Denzell and Dylon Collins. The State responds that Hewlett forfeited this claim, and it lacks merit. Because the issue may arise on re-trial, we note that subsection 115-10.1(c)(2)(A) requires that the *declarants* of the prior inconsistent statements (the Collins brothers) have "personal knowledge" of the subject of their statements (the shooting they witnessed). *People v. Simpson*, 2015 IL 116512, ¶¶ 31-33. Section 115-10.1 does not require the investigator who

assisted in taking the statements have personal knowledge of the events. Investigators rarely, if ever, are eyewitnesses to the crimes they investigate.

¶ 78    Reversed and remanded.